[Cite as *Setters v. Durrani*, 2020-Ohio-6859.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| DANA SETTERS, | : | APPEAL NO. C-190341 |
| | | TRIAL NO. A-1506570 |
| and | : | |
| | | *O P I N I O N.* |
| CRAIG SETTERS, | : | |
| Plaintiffs-Appellees, | : | |
| vs. | : | |
| | : | |
| ABUBAKAR ATIQ DURRANI, M.D., | : | |
| and | : | |
| | : | |
| THE CENTER FOR ADVANCED SPINE | | |
| TECHNOLOGIES, INC., | : | |
| Defendants-Appellants. | : | |

Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed in Part, Reversed in Part, and Cause Remanded

Date of Judgment Entry on Appeal: December 23, 2020

*The Deters Law Firm Co. II, P.A., Robert A. Winter Jr.* and *James F. Maus,* for Plaintiffs-Appellees,

*Taft Stettinius & Hollister LLP, Russell S. Sayre, Aaron M. Herzig* and *Philip D. Williamson*, for Defendants-Appellants.

CROUSE, Judge.

{¶1}   Defendants-appellants Abubakar Atiq Durrani, M.D., and the Center for Advanced Spine Technologies, Inc., ("CAST") appeal the trial court's judgment awarding plaintiffs-appellees Dana and Craig Setters damages in the amount of $849,906 on their claims for negligence, lack of informed consent, and loss of consortium.  For the reasons that follow, we affirm in part the judgment of the trial court, reverse in part the judgment of the trial court, and remand the cause for a set off of the settlement proceeds with West Chester Hospital LLC and UC Health against the jury verdict.

## I.  Facts and Procedure

{¶2}   Dana Setters is a former patient of Durrani.  Setters suffers from Ehlers Danlos Syndrome ("EDS"), a condition that causes hypermobility in her joints and connective tissues.  Setters's EDS particularly affected her shoulders and her back, requiring multiple shoulder surgeries and causing significant back pain over the years. From 2009 to 2012, Setters sought treatment for back pain from several doctors, including Dr. John Roberts, Dr. Brad Tinkle, and Dr. Derek Neilson.  In the fall of 2012, Neilson, a medical genetics doctor with the EDS Clinic at Cincinnati Children's Hospital Medical Center, referred Setters to Durrani.

{¶3}   At her intake appointment on August 30, 2012, Setters described occipital headaches and lower back pain which radiated into her legs.  To evaluate Setters's symptoms, Durrani ordered an MRI of her cervical spine flexion and extension, a rotational CT study of her upper cervical spine, and an MRI of her lumbar spine.

{¶4}   At a follow-up appointment on September 20, 2012, Durrani determined that the test results showed symptoms of rotational instability in Setters's cervical spine. Durrani also determined that the test results showed foraminal stenosis on the right side of Setters's lumbar spine, caused by a small disc herniation at L4-L5 lumber vertebrae.

Based on his perceived significance of instability in the cervical spine, Durrani recommended addressing the cervical spine first and the lumbar spine second.

{¶5}    With regard to the cervical spine, Durrani placed Setters in a temporary neck collar to relieve the occipital symptoms.   Durrani further recommended a stabilizing procedure called a C1-C2 fusion.  Setters agreed and signed a consent form on December 13, 2012.  On December 26, 2012, Durrani performed the cervical fusion using a bone graft substitute called PureGen.

{¶6}    With regard to the lumbar spine, Durrani prescribed an epidural steroid injection to relive the lumbar and leg pain.  Setters went to a pain doctor and received the injection on October 3, 2012. Durrani further recommended a lumbar hemilaminectomy, foraminotomy, and decompression surgery.   Setters agreed and signed a consent form on February 28, 2013.  In March 2013, Durrani performed the lumbar surgeries.

{¶7}    In May 2013, Setters consulted Dr. Lee Greiner, then a neurosurgeon at the Mayfield Brain & Spine Clinic, for perceived postoperative complications.  In June 2013, Greiner referred Setters to Dr. William Tobler for surgical removal of the hardware in her cervical spine.   Tobler performed the surgery on July 26, 2013. Unfortunately, Setters continued to experience ongoing and increased pain.   From December 2013 to the time of trial, Setters attended monthly pain-management treatment with Dr. Humam Akbik.

{¶8}    In December 2015, Setters and her husband, Craig Setters, filed a complaint against Durrani, CAST, West Chester Hospital LLC, and UC Health.  Setters asserted various claims, including negligence, battery, lack of informed consent, intentional infliction of emotional distress, and fraudulent misrepresentation.  Craig Setters asserted a claim for loss of consortium.  Setters eventually reached a settlement

3

with West Chester Hospital LLC and UC Health, and voluntarily dismissed the claims against them.  Durrani and CAST proceeded to trial on all claims in November 2018.

{¶9}    Following three and a half weeks of testimony, the jury returned a verdict in favor of the Setterses, finding Durrani and CAST liable for negligence, lack of informed consent, and loss of consortium.  The jury awarded the Setterses $76,423 for past medical expenses, $73,483 for future medical expenses, $635,000 in noneconomic damages, and $200,000 for loss of consortium.  Following Durrani and CAST's motion for judgment notwithstanding the verdict (the "JNOV motion") and motion for a new trial, the trial court remitted the noneconomic damages to $500,000 and entered a judgment of $849,906 against Durrani and CAST.  This timely appeal followed.

{¶10}   On appeal, Durrani and CAST raise the following four assignments of error:

1.  The trial court erred by admitting evidence of Dr. Durrani's license revocations and prior lawsuits and excluding similar evidence about Dr. Wilkey, the plaintiff's expert witness.

2.  The trial court erred in denying Defendants' motion for judgment notwithstanding the verdict or a new trial.

3.  The trial court should have granted the application for credit under R.C. 2307.28.

4.  The trial court erred by not remitting amounts billed over the amounts Setters paid.

## II.  Evid.R. 403

{¶11} In their first assignment of error, Durrani and CAST challenge an evidentiary ruling which they contend prejudicially impeached Durrani's credibility.  Prior to trial, appellants unsuccessfully sought to exclude evidence that Durrani's Ohio

4

and Kentucky medical licenses had been revoked. They contended that Durrani's license revocations were not relevant to the ultimate issue of negligence and that any relevance was substantially outweighed by its prejudicial value under Evid.R. 403.[1] Setters argues that appellants waived the right to raise this issue on appeal by failing to object to the line of questioning at trial.

{¶12} As a general rule, the grant or denial of a motion in limine is not a definitive ruling on the evidence. *State v. Grubb*, 28 Ohio St.3d 199, 200-201, 503 N.E.2d 142 (1986). Rather, it "is a tentative, interlocutory, precautionary ruling by the trial court." *Id.* at 201-202. Therefore, the grant of a motion in limine generally does not preserve any error for appellate review. *Id.* However, Evid.R. 103 was revised, effective July 1, 2017, to provide: "Once the court rules definitely on the record, either before or at trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal."

{¶13} In this case, appellants filed several pretrial motions in limine. The motions applied to all 400+ captioned cases. In one pretrial order, the court ruled definitely on the record, stating, in part: "The Plaintiffs can use the [Ohio and Kentucky Medical Boards] records to impeach Dr. Durrani regarding his qualification for and application for licensing as a physician. If he was licensed at the time of his treatment of Plaintiff; if he is presently licensed; and if his license was revoked and when it was revoked are all admissible." Based on the definitive nature of the court's order, appellants were not required to renew their objection at trial to preserve this issue for appeal.

---

[1] We note that appellants also assigned error to the admission of prior lawsuits against Durrani. In a pretrial order, the court ruled "[e]vidence of other lawsuits or claims against [appellants]" inadmissible. However, appellants failed to object at trial when Setters's counsel violated the order and questioned Durrani about prior lawsuits. Appellants also failed to present any argument on this issue in their appellate brief, in contravention of App.R. 16(A)(7). For these reasons, we address only the admission of Durrani's medical-license revocations.

{¶14} Finding the issue properly preserved for appeal, we turn now to the merits of the argument. "Evid.R. 403 seeks to eliminate the potential for prejudice of certain evidence by prohibiting its use in certain circumstances." *Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 171, 743 N.E.2d 890 (2001). Evid.R. 403(A) requires the court to weigh the probative value of the evidence against the danger of unfair prejudice, and to exclude evidence substantially more prejudicial than probative. "The trial court has broad discretion in determining whether evidence should be excluded under Evid.R. 403(A)." *City of Cincinnati v. Triton Serv., Inc.*, 2019-Ohio-3108, 140 N.E.3d 1249, ¶ 45 (1st Dist.). A judgment will not be reversed on appeal unless the trial court abused its discretion and a party has been materially prejudiced. *Davis v. Killing*, 171 Ohio App.3d 400, 2007-Ohio-2303, 870 N.E.2d 1209, ¶ 11 (11th Dist.); *State v. Maurer*, 15 Ohio St.3d 239, 265, 473 N.E.2d 768 (1984).

1. Relevancy

{¶15} Our first concern in determining admissibility is relevancy. Appellants contend that evidence regarding Durrani's professional history is not relevant to the ultimate question of his alleged malpractice.

{¶16} In support of their argument, appellants point to *Lambert v. Wilkinson*, 11th Dist. Ashtabula No. 2007-A-0032, 2008-Ohio-2915. In *Lambert*, the plaintiff-patient's counsel questioned the defendant-doctor about the suspension of his medical license. The medical-license suspension centered on the improper billing procedures employed by the defendant-doctor. *Id.* at ¶ 54. The Eleventh District found that the medical-license suspension was not relevant to the plaintiff's medical-malpractice claims. *Id.* Instead, the Eleventh District found that the admission of such evidence proved only the defendant-doctor's "propensity to be dishonest" and

6

"could do nothing more than prejudice the minds of the jurors." *Id.* at ¶ 54-55. Therefore, the Eleventh District held such evidence inadmissible under Evid.R. 403.

{¶17}  We find *Lambert* applicable here.  It was Setters's position at trial that Durrani provided negligent treatment by performing an unnecessary cervical-fusion surgery and by performing lumbar surgery without prior conservative treatment.  Both sides presented competing testimony on the ultimate issue of whether Durrani's treatment fell below the appropriate standard of care.  Therefore, Durrani's qualification as a physician was clearly in question.

{¶18}  However, a review of the record shows that the Ohio and Kentucky Medical Boards revoked Durrani's medical licenses due to an unrelated instance of misconduct.  There is no evidence that the revocations were attributable to the competency, knowledge, or skill possessed by Durrani during the time he performed surgery on Setters.  Rather, the revocations centered on his practice for signing blank prescriptions.  According to the Ohio Medical Board:  "[I]n advance of a trip to Pakistan, Dr. Durrani ha[d] pre-signed blank prescriptions so that his employees (who lacked lawful authority to issue prescriptions) could issue prescriptions for controlled substances to patients while he was unavailable"; "these prescriptions were, in fact, unlawfully issued to certain patients"; and "he had denied these facts in his deposition by a Board attorney."  Because Setters failed to establish any correlation between the unlawful prescriptions Durrani issued and the surgeries he performed on her spine, the license revocations were not probative of the ultimate issue of negligence.

{¶19}  While Setters argues only waiver on appeal, in response to the JNOV motion and motion for a new trial, she argued that Durrani's license revocations were relevant to his credibility under Evid.R. 608.  Evid.R. 608 concerns impeachment of a witness through instances of prior misconduct related to truthfulness.  The

7

circumstances surrounding the revocation of Durrani's medical licenses indisputably related to his propensity for truthfulness. However, Setters's counsel did not elicit the facts underlying the revocations.[2] And the mere fact that Durrani's medical licenses were revoked is not probative of his truthfulness. Therefore, while we cannot say that the admission of such evidence had no bearing on the issue of Durrani's credibility, it did little more than prejudice the minds of the jurors. *Lambert* at ¶ 54.

### 2. Unfair Prejudice

{¶20} In a medical-malpractice case, evidence that a defendant-doctor's medical license was revoked is by its very nature prejudicial. It predisposes the jury to find that the doctor acted outside acceptable bounds of competence. However, "this alone does not amount to unfair prejudice." *King v. Ahrens*, 16 F.3d 265, 269-270 (8th Cir.1994). "Unfair prejudice is that quality of evidence which might result in an improper basis for a jury decision." *Oberlin*, 91 Ohio St.3d at 172, 743 N.E.2d 890. Unfairly prejudicial evidence usually appeals to the jury's emotions rather than intellect. *Id.* Evidence that "arouses the jury's emotional sympathies, evokes a sense of horror, or appeals to an instinct to punish" may be unfairly prejudicial. *Id.*

{¶21} The danger of unfair prejudice is readily apparent in this case. Setters's counsel used evidence of the license revocation in such a way that it invited the jury to draw an improper inference about Durrani's credibility. For example, in opening statements, Setters's counsel told the jury, "You're going to learn a significant amount of lies regarding his background and how he practiced medicine. His Kentucky and Ohio licenses are and were permanently revoked. The emphasis on that statement is 'permanently.' " On cross-examination, Setters's counsel asked Durrani "your medical license was permanently revoked by the State of Ohio, correct?" and "your Kentucky

---

[2] Because the relevant evidence was not presented at trial, we take no position as to how its admission under Evid.R. 608 would affect our analysis under Evid.R. 403.

medical license was revoked, correct?" without any further exploration. Finally, in closing arguments, Setters's counsel stated, "And the testimony from Dr. Durrani, he said his Kentucky license and his Ohio license were both revoked. They weren't retried. They were revoked. That's a positive action by those states." Under these circumstances, one could easily infer that Durrani was an incompetent physician when he treated Setters. This risk of prejudice is compounded where both sides presented competing expert testimony and the credibility of the witnesses was paramount. Thus, despite its minimal relevance, evidence of the license revocation allowed the jury to improperly infer that Durrani was not credible and that his conduct must have been substandard. Because the evidence could influence the case on an improper basis, we find that the trial court abused its discretion in admitting evidence of Durrani's medical licenses being revoked under Evid.R. 403.

3. Harmless Error

{¶22} "An improper evidentiary ruling constitutes reversible error only when the error affects the substantial rights of the adverse party or the ruling is inconsistent with substantial justice." *Beard v. Meridia Huron Hosp.*, 106 Ohio St.3d 237, 2005-Ohio-4787, 834 N.E.2d 323, ¶ 35. In determining whether substantial justice has been done, a reviewing court must weigh the prejudicial effect of the errors and determine whether the trier of fact would have reached the same conclusion had the errors not occurred. *O'Brien v. Angley*, 63 Ohio St.2d 159, 164-165, 407 N.E.2d 490 (1980). Without an outcome-determinative effect, the errors are deemed harmless. Civ.R. 61.

{¶23} In light of the facts of this case, we find that the erroneous admission of Durrani's license revocations was harmless. Significantly, the trial transcripts reflect that Durrani was effectively impeached on a number of other topics relating to his

credibility. For instance, the court allowed Setters's counsel to extensively probe the inaccuracies on Durrani's medical license applications. Setters's counsel elicited Durrani's failure to disclose pending medical-malpractice claims on his medical application and application renewals. Setters's counsel also elicited Durrani's failure to disclose pending nonmedical-malpractice litigation on his medical application renewals. Finally, Setters's counsel thoroughly explored Durrani's misrepresentations on his licensing verifications, including his indication that he attended Bolan Medical College when he testified that he attended Army Medical College.

{¶24} In contrast, evidence of Durrani's license revocations was mentioned only three times throughout the nearly month-long trial. Setters's counsel made a single mention of the revocations during both opening statements and closing arguments. Setters's counsel also cross-examined Durrani about his license revocations with two questions (the same question for each state). Therefore, the license revocations shed little new light on Durrani's credibility.

{¶25} In addition, the record reflects substantial competent evidence to support the jury's verdict. All of the treating physicians and all of Setters's experts agreed that the cervical fusion was unnecessary. All of the doctors who examined pre- or post-operative diagnostic testing found no evidence of cervical instability. Several of the treating physicians and experts also agreed that Durrani lacked conservative care on Setters's lumbar, which violated the standard of care. Setters's counsel never expressly linked the license revocation to the overwhelming evidence of negligence.

{¶26} Given the significance of the other evidence, the limited nature of the disclosure, and the otherwise lengthy impeachment of Durrani's credibility, we hold that evidence of Durrani's license revocations did not affect appellants' substantial rights, and therefore, was harmless. Therefore, the trial court's admission of such

evidence did not amount to reversible error. We accordingly overrule appellants' first assignment of error.

### III. Motion for Judgment Notwithstanding the Verdict and Motion for a New Trial

{¶27} In their second assignment of error, appellants challenge the trial court's denial of their motion for judgment notwithstanding the verdict and motion for a new trial on the award of noneconomic damages, award of future economic damages, issue of conservative care, and application of the real-party-in-interest rule.[3]

{¶28} We review a trial court's denial of a JNOV motion de novo. *Pierce v. Durrani*, 2015-Ohio-2835, 35 N.E.3d 594, ¶ 10 (1st Dist.); *Environmental Network Corp. v. Goodman Weiss Miller, L.L.P.*, 119 Ohio St.3d 209, 2008-Ohio-3833, 893 N.E.2d 173, ¶ 23. A JNOV motion tests the legal sufficiency of the evidence. *Environmental Network Corp.* at ¶ 23. "The evidence adduced at trial * * * must be construed most strongly in favor of the party against whom the motion is made, and, where there is substantial evidence to support his side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied." *Posin v. A. B. C. Motor Court Hotel, Inc.*, 45 Ohio St.2d 271, 275, 344 N.E.2d 334 (1976).

{¶29} We review a trial court's denial of a motion for a new trial under an abuse-of-discretion standard. *Pierce* at ¶ 10.

---

[3] Although not included in the assignment of error, in three of the arguments, appellants also challenge the trial court's denial of their motion for a directed verdict. We note that the standard of review for a ruling on a motion for a directed verdict is the same one used for a JNOV motion. *Posin v. A.B.C. Motor Court Hotel, Inc.*, 45 Ohio St.2d 271, 275, 344 N.E.2d 334 (1976).

1. Noneconomic Damages

**{¶30}** Appellants first argue that the trial court erred in denying the motion for a directed verdict, judgment notwithstanding the verdict, and a new trial because Setters did not suffer a catastrophic injury.

**{¶31}** R.C. 2323.43(A) limits a plaintiff's noneconomic damages in medical-malpractice actions. In general, noneconomic damages may not exceed the greater of $250,000 or three times the plaintiff's economic loss, subject to a maximum of $350,000 for each plaintiff or $500,000 for each occurrence. R.C. 2323.43(A)(2). However, if the plaintiff sustained certain injuries, noneconomic damages may exceed the general limitations to a maximum of $500,000 for each plaintiff or $1,000,000 for each occurrence. R.C. 2323.43(A)(3). These injuries include:

(a) Permanent and substantial physical deformity, loss of use of a limb, or loss of a bodily organ system; or

(b) Permanent physical functional injury that permanently prevents the injured person from being able to independently care for self and perform life sustaining activities.

R.C. 2323.43(A)(3)(a)-(b).

**{¶32}** Here, the jury found that Setters suffered a permanent and substantial physical deformity under R.C. 2323.42(A)(3)(a). Setters's injuries consisted of an abnormal cervical posture, or a tilt in the right side of her neck; a reduction in her cervical range of motion; two moveable nodules in her neck; and surgical scars. The description of injuries is not disputed. Rather, it is the legal conclusion of whether these injuries meet the threshold definition of "permanent and substantial deformity."

12

{¶33} The General Assembly did not define the phrase "permanent and substantial physical deformity" in the statute, nor have we done so in our prior opinions. However, under the plain and ordinary meaning of the word, a "deformity" is "a physical blemish or distortion" or "the state of being deformed," deformed meaning "unshapely in form" or "misshapen." *Merriam-Webster's Online Dictionary*, https://www.merriam-webster.com/dictionary/deformity, and https://www.merriam-webster.com/dictionary/derformed (accessed Dec. 1, 2020).

{¶34} The only Ohio court to address "permanent and substantial physical deformities" for purposes of R.C. 2323.42(A)(3)(a) is the Fifth Appellate District in *Johnson v. Stachel*, 5th Dist. Stark No. 2019CA00123, 2020-Ohio-3015. In *Johnson*, the plaintiff brought suit against the defendant-doctor for failure to timely diagnose a hip fracture. Due to the defendant-doctor's negligence, the plaintiff suffered chronic shortening of one leg and hip instability. *Id.* at ¶ 76. The plaintiff eventually required complete removal of his hip joint, rendering his hip nonweightbearing. *Id.* The Fifth District held that the permanent shortening of one leg and the surgical removal of a hip joint constituted "a structural change to [plaintiff's] skeletal system," and thus, a permanent and substantial physical deformity. *Id.*

{¶35} The federal courts have greatly elaborated on this issue, noting that "any 'permanent and substantial physical deformity' must be 'severe and objective.' " *Sheffer v. Novartis Pharmaceuticals Corp.*, S.D.Ohio No. 3:12-cv-238, 2014 WL 10293816, *2 (July 15, 2014), quoting *Weldon v. Presley*, N.D.Ohio No. 1:10 CV 1077, 2011 WL 3749469, *6 (Aug. 9, 2011). The "statutory cap is lifted only for 'catastrophic' injuries." *Sheffer* at *1, citing *Arbino v. Johnson & Johnson*, 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420.

13

{¶36} According to federal case law, "catastrophic injuries" may include misshapen or distorted conditions, restricted use of body parts, and significant scarring. For example, in *Ross v. Home Depot USA Inc.*, S.D.Ohio No. 2:12-CV-743, 2014 WL 4748434 (Sept. 23, 2014), the plaintiff brought a premises-liability suit against the defendant-store. As a result of tripping and falling over an extension cord, the plaintiff suffered multiple "misshapened," "unnatural," and "distorted" conditions in both her left knee and her shoulder. *Id.* at *6. The plaintiff's treatment also required a significant amount of hardware to be implanted into her body. *Id.* The Southern District of Ohio held these injuries constituted sufficient evidence to submit the issue of a permanent and substantial physical deformity to the jury. *Id.* at *7.

{¶37} Similarly, in *Cawley v. Eastman Outdoors, Inc.*, N.D.Ohio No. 1:14-CV-00310, 2014 WL 5325223 (Oct. 17, 2014), the plaintiff brought a products-liability suit against the defendant-distributor for an allegedly defective arrow. While practicing archery, the arrow shattered upon release and pierced the plaintiff's left hand. *Id.* at *1. As a result of several subsequent surgeries, the plaintiff suffered "lasting injuries to his hand, including a scar, decreased range of motion, diminished grip strength, and ongoing pain." *Id.* The Northern District of Ohio held that "the scar on his left hand and thumb, as well as other external and internal deformities," was sufficient for the permanent-and-substantial-physical-deformity exception to the statutory cap on damages. *Id.* at *7.

{¶38} In this case, all of the treating doctors and experts agreed that Setters's spinal anatomy changed as a result of the surgeries. Much like the plaintiff in *Cawley*, Setters suffered a restricted range of motion in her neck. According to Greiner, Setters could only rotate her neck approximately 20 degrees in either direction (normal rotation being 45-75 degrees). Akbik further testified that Setters could not laterally rotate or

14

bend her neck. Setters also suffered from a "misshapen" neck, similar to the plaintiff's knee and shoulder in *Ross*. Setters testified that her head began "fall[ing] to the side" approximately one month after surgery. According to Setters, "[i]t just gradually kept getting worse" until she could no longer keep her head up straight. Setters stated that she could "straighten [her neck] some," but "it won't stay." All of the treating doctors and experts agreed that Setters sustained an abnormal cervical posture, or side flexion of her neck, from the C1-C2 fusion. Thus, taking into consideration the dictionary definitions and applicable case law, we find there was sufficient evidence to submit the issue of "permanent and substantial physical deformity" to the jury. We accordingly hold that the trial court did not err in denying the motion for a directed verdict, the JNOV motion, and the motion for a new trial on the award of noneconomic damages.

### 2. Future Economic Damages

{¶39} Appellants next argue that the trial court erred in denying the motion for a directed verdict, judgment notwithstanding the verdict, and a new trial when the jury's award of future damages was not supported by the weight of the evidence but was instead based only on improper speculation.

{¶40} Future damages are limited to losses which the plaintiff is reasonably certain to incur from the injuries. *Galayda v. Lake Hosp. Sys., Inc.*, 71 Ohio St.3d 421, 425, 644 N.E.2d 298 (1994). A plaintiff's claim for future medical expenses must be supported by evidence that reasonably establishes the amount to be incurred in the future. *Stone v. Patarini*, 9th Dist. Lorain No. 98CA007242, 2000 WL 799102, *3 (June 21, 2000). "[T]he jury cannot be allowed to speculate or guess in making allowance for future medical expenses, and, to this end, there must be some data furnished to the jury upon which to predicate an estimate of future costs." (Internal quotations omitted.)

15

*Waller v. Phipps*, 1st Dist. Hamilton No. C-000758, 2001 WL 1077942, *4 (Sept. 14, 2001).

**{¶41}** Appellants argue that Setters failed to present sufficient evidence to reasonably estimate the cost of future medical expenses. Appellants contend that plaintiff's expert Dr. Keith Wilkey's testimony about future surgeries was too speculative and that an award of future damages was not otherwise supported by the record. In support of their argument, appellants point to *Waller* and *Hammerschmidt v. Mignogna*, 115 Ohio App.3d 276, 685 N.E.2d 281 (8th Dist.1996).

**{¶42}** In *Waller*, this court analyzed whether the defendants were entitled to a directed verdict on the issue of future medical expenses. The plaintiff's surgeon testified that the plaintiff would continue to experience pain in the future. *Id.* at *3. However, he did not testify as to how long or how often the plaintiff would require office visits. *Id.* at *4. The plaintiff's surgeon also did not indicate whether the plaintiff would need any future surgeries, physical therapy, or specific medical treatment. *Id.* And none of the other physicians were asked to outline a future course of treatment, provide details concerning the nature of the treatment, or project the expected costs. *Id.* Without any expert testimony on the nature and extent of the plaintiff's future medical treatment, this court held that future damages could not be reasonably established and vacated the part of the judgment allotted for those expenses. *Id.* at *4-5.

**{¶43}** In *Hammerschmidt*, the Eighth District analyzed whether the plaintiff was entitled to jury instructions on the issue of future medical expenses. The plaintiff's doctor testified that the plaintiff would be disabled unless he underwent surgery to alleviate the pain and weakness. *Hammerschmidt* at 281. He estimated the cost of surgery to be $10,932. *Id.* at 282. The plaintiff testified that he would

16

undergo surgery when he could afford it. *Id.* at 281. However, the plaintiff failed to present evidence that the surgery would in fact occur, when the surgery would take place, and the expected duration of future pain and suffering. *Id.* at 282. Given these uncertainties, the Eighth District held that future damages were not reasonably certain and the plaintiff was not entitled to jury instructions on the issue of future damages. *Id.* at 281.

{¶44} In this case, Setters suffered lasting damage to her neck which caused abnormal cervical posture, a restricted range of motion, and increased pain. Only one expert witness, Wilkey, opined as to Setters's need for future surgeries. Wilkey testified that Setters would eventually need a corrective osteotomy on her neck and another C1-C2 fusion. Wilkey estimated the cost of future surgery to be "upwards of $200,000." However, Setters testified that she was not willing to undergo any further surgeries. She stated, "I didn't want nobody to touch my spine after Durrani." Thus, the prospect of future surgery was too speculative and the jury could not have awarded future damages on that basis. *See Hammerschmidt*, 115 Ohio App.3d 276, 685 N.E.2d 281; *see also Scott v. Condo*, 1st Dist. Hamilton No. C-010123, 2002-Ohio-2148; *Thompson v. City of Brook Park*, 8th Dist. Cuyahoga No. 84068, 2004-Ohio-5024, ¶ 29.

{¶45} Unlike the plaintiff in *Hammerschmidt*, however, Setters presented evidence of nonsurgical future medical expenses. At the time of trial, Setters had engaged in monthly pain-management services with Akbik for five years. Akbik testified that Setters would need monthly visits for pain management "probably, for the rest of her life." Setters also submitted evidence of the past medical bills she incurred from Akbik over the five years leading up to trial. The medical bills reflected the cost of monthly visits for pain management and medicine-management care. Thus, Setters presented evidence of how long she would require visits, how often

she would require visits, and the costs associated with these types of procedures. Accordingly, Setters remedied the issues present in *Waller* and *Hammerschmidt*, and presented sufficient evidence of nonsurgical future medical expenses.

{¶46} Upon a review of the verdict, it is clear that the jury awarded damages for future nonsurgical medical expenses, not all potential future medical expenses. The jury awarded Setters $73,483 for future medical expenses, not $200,000 for the remote possibility of a future surgery. Based on Akbik's testimony, which detailed Setters's need for continued pain-management treatment, and the past medical bills, which demonstrated the nature and amount of past pain-management expenses, the jury's award of $73,483 was well within the range supported by the evidence. Therefore, we conclude that there was sufficient evidence to support the jury's award of future medical expenses and that appellants were not entitled to a directed verdict, JNOV, or a new trial on that issue.

### 3. Conservative Care

{¶47} Third, appellants argue that the trial court erred in denying the motion for a directed verdict, judgment notwithstanding the verdict, and a new trial when the plaintiffs failed to establish what conservative care would have obviated the need for surgery.

{¶48} The crux of a medical-malpractice claim is whether the defendant-doctor's treatment fell below the appropriate standard of care. *Clark v. Doe*, 119 Ohio App.3d 296, 307, 695 N.E.2d 276 (1st Dist.1997). Here, the jury found that Durrani violated the standard of care by (1) performing an unnecessary cervical-spine surgery, and (2) failing to undergo conservative care prior to preforming lumbar surgery. Appellants argue that there was insufficient evidence for the jury to

conclude that Durrani's decision to preform lumbar surgery without prior conservative treatment violated the standard of care.

{¶49} While several expert witnesses concluded that Setters may have been a candidate for lumbar surgery in the future, all of them agreed that the standard of care required continued conservative treatment prior to operative treatment. For instance, Dr. Steven Bloomfield, one of Setters's expert witnesses, testified that the standard of care requires conservative treatments prior to surgery. Bloomfield noted that Durrani ordered a singular epidural injection. However, Bloomfield further testified that Durrani "did not prescribe any physical therapy or medications or any injections other than the one injection in the lumbar spine." According to Bloomfield, "the standard of care is very clear to use these conservative measures first." Bloomfield testified that he did not see any reason, based on Setters's medical history and her CAST intake form, to not go forward with a course of conservative therapy. Therefore, Bloomfield opined that Durrani's failure to prescribe medication and recommend a course of conservative therapy was a breach of the standard of care.

{¶50} Wilkey also testified that the standard of care requires six weeks to three months of conservative care prior to lumbar surgery. According to Wilkey, conservative care for lumbar pain consists of "an onset of medications, physical therapy, maybe an epidural injection." Akbik further testified that the normal conservative care for lumbar pain consists of physical therapy, aqua therapy, chiropractic evaluations, TENS unit, nerve blocks, and multiple lumbar epidural injections.

{¶51} Durrani and his expert witnesses presented competing testimony. They agreed that conservative measures such as epidural injections and physical therapy could alleviate lumbar pain. Dr. Jerome Barakos, one of Durrani's expert witnesses, testified that "quite an effort was made in terms of making sure that conservative

measures were exhausted before proceeding to surgical [measures]." In particular, Barakos noted Durrani's use of medical imaging, oral medication, and an epidural injection. However, according to Durrani, "once you have a foraminal stenosis the only way to decompress the foramina is [surgical removal of the spinal facet]." Nonetheless, the jury was free to weigh all of the testimony and credit the testimony of Setters's witnesses over that of Durrani and his witnesses.

{¶52} Under these circumstances, there was sufficient evidence to support the jury's conclusion that Durrani's choice of operative treatment on Setters's lumbar violated the standard of care. We accordingly hold that the trial court did not err in denying the motion for a directed verdict, the JNOV motion, and the motion for a new trial on the issue of conservative care.

### 4.   Real Party in Interest

{¶53} Fourth, appellants argue that the trial court erred in denying the motion for judgment notwithstanding the verdict when only Setters's insurance company could bring an action for past medical bills. Appellants contend that Setters was not the real party in interest because Blue Cross Blue Shield ("BC/BS") paid all of the past medical bills, and thus, was the sole real party in interest.

{¶54} Civ.R. 17(A) requires a complaint to be brought in the name of the real party in interest. "The purpose behind the real party in interest rule is * * * to enable the defendant to avail himself of evidence and defenses that the defendant has against the real party in interest, and to assure him finality of the judgment, and that he will be protected against another suit brought by the real party at interest on the same matter." (Internal quotations omitted.) *Shealy v. Campbell*, 20 Ohio St.3d 23, 24-25, 485 N.E.2d 701 (1985).

{¶55} There is no evidence in the record that BC/BS paid all of Setters's past medical bills. In fact, there was evidence presented to the contrary. Setters testified that she incurred medical bills and expenses with all of the treating physicians. Setters further testified that the surgeries "put stress on [her and her husband] * * * financially." When asked about her living situation, Setters stated, "We have our own house but it's – I mean it's tough because of medical bills[.]" Therefore, Setters could pursue the full amount of damages unless the issue of joinder was properly raised. *Holibaugh v. Cox*, 167 Ohio St. 340, 345-346, 148 N.E.2d 677 (1958) ("An insured who is injured by a tortious act retains ownership of the resultant claim for damages against the tort-feasor in that he may, in the absence of a motion or a raising of the issue of joinder, maintain an action thereon in his own name for the full amount of damages, even though he has made a partial assignment of the claim to an insurer.").

{¶56} The real-party-in-interest rule concerns proper party joinder. *Fed. Home Loan Mortg. Corp. v. Schwartzwald*, 134 Ohio St.3d 13, 2012-Ohio-5017, 979 N.E.2d 1214, ¶ 33. Civ.R. 19(A) instructs that a person "shall be joined as a party in the action if * * * he has an interest relating to the subject of the action as an assignor, assignee, subrogor, or subrogee." The failure to join a necessary party is procedural and can be waived if it is not timely asserted. Civ.R. 19(A).

{¶57} Under Civ.R. 12(H), a defense of failure to join a party may be asserted in an answer, by motion for judgment on the pleadings, or at the trial on the merits. However, several Ohio courts have held that "merely raising the defense in an answer 'without further affirmative action to prosecute the raised defense results in a waiver of said defense.' " *Nationwide Mut. Fire Ins. Co. v. Logan*, 12th Dist. Butler No. CA2005-07-206, 2006-Ohio-2512, ¶ 24, quoting *Mihalic v. Figuero*, 8th Dist. Cuyahoga No. 53921, 1998 WL 86428, *3 (May 26, 1988). *See Garcia v. O'Rourke*, 4th Dist. Gallia No.

21

04CA7, 2005-Ohio-1034, ¶ 19 ("An unspecific and unsupported allegation of failure to join a party, without further affirmative action to prosecute the raised defense, does not provide the trial court with information necessary to adjudicate the claimed defense. Thus, a mere conclusory allegation results in a waiver of the defense."). *See also Monus v. Day*, 7th Dist. Mahoning No. 10MA35, 2011-Ohio-3170; *Brown v. Miller*, 11th Dist. Geauga No. 2012-G-3055, 2012-Ohio-5223. We find these cases persuasive and adopt their reasoning herein, holding that a party waives the right to claim a necessary party was not joined when it does not take affirmative action to pursue that defense.

{¶58} In this case, BC/BS possessed a subrogated interest to Setters's past medical expenses and was a party united in interest with Setters. Appellants did raise the real-party-in-interest rule in their answer to Setters's complaint. However, appellants provided no more than a conclusory, blanket statement and did not name any specific parties in interest. The appellants simply stated: "To the extent Plaintiff's medical bills have been paid by others who may have a subrogation interest, Plaintiff's Complaint is not prosecuted in the name of the real party in interest." Thereafter, appellants did not file a motion to dismiss for failure to join a party, move to join BC/BS, or request an appropriate jury instruction at trial. Appellants cannot avail themselves of the protection of the real-party-in-interest rule when they made no real effort to pursue the defense. Thus, despite the fact that they briefly raised it in their answer, appellants waived the defense. We accordingly hold that the trial court did not err in denying the JNOV motion on the issue of the real-party-in-interest rule.

5. Cumulative Error

{¶59} Finally, appellants argue that the cumulative effect of the errors warranted a judgment notwithstanding the verdict or a new trial.

**{¶60}** We recognize that the doctrine of cumulative error applies in the civil context. *See Katz v. Enzer*, 29 Ohio App.3d 118, 504 N.E.2d 427 (1st Dist.1985). However, the cumulative-error doctrine is inapplicable where there are not multiple instances of harmless error. *State v. Leach*, 150 Ohio App.3d 567, 2002-Ohio-6654, 782 N.E.2d 631, ¶ 57 (1st Dist.). Because there is only one instance of harmless error, we cannot find cumulative error. Thus, the trial court did not err in denying the JNOV motion and the motion for a new trial.

**{¶61}** Appellants' second assignment of error is overruled.

### IV. Right to Credit

**{¶62}** In their third assignment of error, appellants contend that the trial court erred in denying set off of the settlement proceeds with West Chester Hospital LLC and UC Health against the jury verdict. If a settling defendant is liable for any of the tort plaintiff's damages, then a nonsettling defendant is entitled to a setoff under R.C. 2307.28. On appeal, Setters conceded that the trial court should have granted appellants' application for setoff. Therefore, appellants' third assignment of error is sustained.

### V. Remittitur

**{¶63}** In their fourth and final assignment of error, appellants challenge the trial court's award of $149,906 in economic damages and $500,000 in noneconomic damages. Appellants argue that the $149,906 in economic damages are actually noneconomic damages subject to a $500,000 cap because BC/BS (not Setters personally) paid the past medical expenses. Thus, appellants contend that the trial court erred in entering a total judgment of more than $500,000 and seek a remittitur to that effect.

{¶64} R.C. 2323.43 governs the amounts recoverable for economic and noneconomic losses in a civil action. Under R.C. 2323.43(A)(1), a plaintiff may recover unlimited economic damages. Under R.C. 2323.43(A)(2) and (A)(3), a plaintiff may recover limited noneconomic damages. Noneconomic damages are generally limited to the greater of $250,000 or three times the amount of economic damages, subject to a maximum of $350,000 per plaintiff or $500,000 per occurrence. R.C. 2323.43(A)(2). However, noneconomic damages for catastrophic injuries are limited to $500,000 per plaintiff or $1,000,000 per occurrence. R.C. 2323.43(A)(3).

{¶65} R.C. 2323.43(H) defines economic and noneconomic loss as follows:

(1) "Economic loss" means any of the following types of pecuniary harm:

(a) All wages, salaries, or other compensation lost as a result of an injury, death, or loss to person or property that is a subject of a civil action upon a medical, dental, optometric, or chiropractic claim;

(b) All expenditures for medical care or treatment, rehabilitation services, or other care, treatment, services, products, or accommodations as a result of an injury, death, or loss to person or property that is a subject of a civil action upon a medical, dental, optometric, or chiropractic claim;

(c) Any other expenditures incurred as a result of an injury, death, or loss to person or property that is a subject of a civil action upon a medical, dental, optometric, or chiropractic claim, other than attorney's fees incurred in connection with that action.

* * *

(3) "Noneconomic loss" means nonpecuniary harm that results from an injury * * * including, but not limited to, pain and suffering, loss of society, consortium, companionship, care, assistance, attention,

24

protection, advice, guidance, counsel, instruction, training, or education, disfigurement, mental anguish, and any other intangible loss.

{¶66} Appellants argue that an insurance company's payment of medical expenses constitutes "noneconomic loss" under R.C. 2323.43(H)(3). In contrast, Setters argues that any payment of medical expenses (regardless of the payor's identity) constitutes an "economic loss" under R.C. 2323.43(H)(1)(b). We agree with Setters.

{¶67} Noneconomic damages are "inherently subjective." *Arbino v. Johnson & Johnson*, 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, ¶ 54. Noneconomic damages are "difficult to calculate" and "lack a precise economic value." *Id.*

{¶68} On the other hand, economic damages are "objective and determinable in relation to trade." *State v. Ciresi*, 2020-Ohio-5305, ____ N.E.3d ____, ¶ 27 (11th Dist.). Under R.C. 2323.43(H)(1)(b), economic damages include "[a]ll expenditures for medical care or treatment." The General Assembly did not define the word "expenditure" in R.C. 2323.43(H). However, under the plain and ordinary meaning of the word, an "expenditure" is "the act or process of expending," expending being "to pay out" or "spend." *Merriam-Webster's Online Dictionary,* https://www.merriam-webster.com/dictionary/expenditure and https://www.merriam-webster.com/dictionary/expending (accessed Dec. 1, 2020). And R.C. 2323.43(H)(1)(b) includes "all expenditures," not "expenditures of the plaintiff." Therefore, under a plain reading of the statute, "expenditures" encompass all pay outs of funds. *State ex rel. Lee v. Karnes*, 103 Ohio St.3d 559, 2004-Ohio-5718, 817 N.E.2d 76, ¶ 27 (We must "presume that the legislature says in a statute what it means and means in a statute what it says there.").

{¶69} Based on the structure and plain language of R.C. 2323.43(H), we conclude that any payment of medical bills (regardless of the payor's identity)

constitutes "expenditures for medical care or treatment," and thus, "economic loss" under R.C. 2323.43(H)(1)(b). Therefore, the trial court did not err in awarding Setters $149,906 in economic damages in addition to $500,000 in noneconomic damages. Appellants are not entitled to a remittitur and their fourth assignment of error is overruled.

### VI. Conclusion

{¶70} For the foregoing reasons, we overrule the first, second, and fourth assignments of error and affirm the judgment of the trial court. However, we sustain the third assignment of error, reverse the judgment of the trial court, and remand the cause for the sole purpose of recalculating damages.

Judgment accordingly.

**MYERS, P.J.,** and **BERGERON, J.,** concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.