[Cite as *Densler v. Durrani*, 2024-Ohio-14.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| BETHANY DENSLER, Administrator of the Estate of Robert Densler, | : | APPEAL NO. C-230016<br>TRIAL NO. A-1706561 |
| Plaintiff-Appellee, | : | |
| vs. | : | *O P I N I O N.* |
| ABUBAKAR ATIQ DURRANI, M.D., | : | |
| and | : | |
| CENTER FOR ADVANCED SPINE TECHNOLOGIES, INC., | : | |
| Defendants-Appellants. | : | |

Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Reversed and Cause Remanded

Date of Judgment Entry on Appeal: January 5, 2024

*Robert A. Winter, Jr., James F. Maus* and *Benjamin M. Maraan II*, for Plaintiff-Appellee,

*Taft Stettinius & Hollister LLP, Philip D. Williamson, Aaron M. Herzig, Russel S. Sayre, Alex Van Dyke, Anna M. Greve, Lindhorst & Dreidame Co., L.P.A., James F. Brockman* and *Paul Vollman*, for Defendants-Appellants.

**ZAYAS, Presiding Judge.**

{¶1}   Defendants-appellants Abubakar Atiq Durrani, M.D., and the Center for Advanced Spine Technologies, Inc., ("CAST") (collectively "defendants") appeal the judgments of the Hamilton County Court of Common Pleas, which denied their motion for judgment notwithstanding the verdict and for a new trial and awarded former plaintiff Robert Densler[1] compensatory and punitive damages consistent with the jury's verdict in his favor on his fraudulent-misrepresentation claim in the amount of $162,021.20.   In a single assignment of error, defendants assert that the trial court erred in denying their motion for judgment notwithstanding the verdict and/or for a new trial.   For the following reasons, we sustain the assignment of error, reverse the trial court's judgment, and remand the cause for further proceedings consistent with this opinion and the law.

## I. Brief Factual and Procedural Background

{¶2}   The instant malpractice action stems from a spinal surgery performed by Dr. Durrani on Robert Densler.   Mr. Densler was referred to Dr. Durrani by his primary-care physician in 2012 after conservative treatment attempts for back pain were unsuccessful.   Mr. Densler testified that, at his first visit with Dr. Durrani, x-rays were completed, and Dr. Durrani put the x-rays "up on that light" and told him that his back was broken and he had a lower-lumbar fracture.   Dr. Durrani then allegedly told him that he would be paralyzed without surgery.   Dr. Durrani ultimately performed the recommended spinal surgery on Mr. Densler that same year.

{¶3}   Mr. Densler subsequently brought claims against Dr. Durrani relating to the surgery for negligence, battery, fraudulent misrepresentation, and lack of

---

[1] Bethany Densler, Administrator of the Estate of Robert Densler, was ultimately substituted as the plaintiff in this action in place of Robert Densler on August 29, 2022, by order of the trial court.

informed consent, and against CAST for vicarious liability. After a nine-day trial where both sides presented extensive expert testimony, as well as other evidence, regarding all the issues, the jury rendered a verdict in favor of Mr. Densler on the fraudulent-misrepresentation claim and awarded Mr. Densler $62,021.20 in compensatory damages for past medical expenses and $100,000 in punitive damages. The verdict was based on the jury's finding that Dr. Durrani fraudulently misrepresented the necessity or medical indication for the surgery. Relative to punitive damages, the jury found that Dr. Durrani "acted with malice and aggravated or egregious fraud" by telling Mr. Densler "that he would be paralyzed without the surgery and lose control of bodily functions."

{¶4} Defendants subsequently moved for judgment notwithstanding the verdict and/or for a new trial, asserting several grounds of error including, among others, that the trial court erred in allowing Mr. Densler to pursue a claim for past medical expenses at trial. The trial court ultimately denied the motion on all grounds, except to order that the compensatory-damages award for past medical expenses—if and when paid—be retained by the court "until the issue of what amount of the $62,021.20 is due to Medicare is resolved." Defendants now appeal. In a single assignment of error, defendants argue that the trial court erred in denying their motion for judgment notwithstanding the verdict and/or for a new trial.

## II. Law and Analysis

### A. Standing to Seek Past Medical Damages

{¶5} Defendants argue that Mr. Densler lacked standing to seek past medical damages at trial because Mr. Densler's insurer, Medicare, paid the remaining amount

owed on Mr. Densler's medical bills after certain adjustments were made.[2] *See generally Robinson v. Bates*, 112 Ohio St.3d 17, 2006-Ohio-6362, 857 N.E.2d 1195, ¶ 17-18 (distinguishing between the amount originally billed and the amount ultimately accepted as payment by the medical provider and holding that both are admissible to prove the reasonableness and necessity of the charges rendered for medical and hospital care as the jury may decide that the reasonable value of the medical care is the amount originally billed, the amount the medical provider accepted as payment or some amount in between). Because defendants present this argument as an issue of standing, we consider this issue first.

{¶6} We recently addressed a similar argument in *McCann v. Durrani*, 1st Dist. Hamilton Nos. C-220025 and C-220033, 2023-Ohio-3953. We clarified in *McCann* that an injured party does not lose his or her standing to sue merely because he or she did not suffer certain economic damages. *Id*. at ¶ 22. This is because, in a medical-malpractice case, where various alleged economic and noneconomic losses arise out of the same tortious act, only a single cause of action arises from those injuries and—regardless of the separate items of damage that may be awarded for such act—we do not consider a plaintiff's claim for those various types of damages under the rubric of standing to invoke the court's jurisdiction. *Id*.

{¶7} Rather, where there is a question of whether an injured party may seek certain economic damages paid by the insurer, the proper consideration is whether the joinder rules have been satisfied as to the real party in interest. *See id*. at ¶ 27. Every action must be prosecuted in the name of the real party in interest. Civ.R. 17(A). However, "[n]o action shall be dismissed on the ground that it is not prosecuted in the

---

[2] Evidence was submitted at trial showing that, while Medicare was billed for medical expenses in the amount of $277,813.99, Medicare ultimately paid only $62,021.20 on Mr. Densler's behalf.

name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest." *Id.*

{¶8} " 'The purpose behind the real party in interest rule is * * * to enable the defendant to avail himself of evidence and defenses that the defendant has against the real party in interest, and to assure him finality of the judgment, and that he will be protected against another suit brought by the real party at interest on the same matter.' " *McCann* at ¶ 21, quoting *Setters v. Durrani*, 2020-Ohio-6859, 164 N.E.3d 1159, ¶ 54 (1st Dist.).

{¶9} Here, Medicare possesses a statutory right of subrogation under 42 U.S.C. 1395y(b)(2)(B)(iv), which provides, "The United States shall be subrogated (to the extent of payment made under this title [42 U.S.C. 1395 et seq.] for such an item or service) to any right under this subsection of an individual or other entity to payment with respect to such item or service under a primary plan." *See* 42 C.F.R. 411.26(a). Thus, no party disputes that Medicare was a real party in interest to the extent of the payments made on Mr. Densler's behalf. Rather, the disputed issue is whether Medicare was the *sole* real party in interest as to Mr. Densler's claim of past medical expenses.

{¶10} Defendants argue that Medicare paid the entire amount of Mr. Densler's medical expenses and therefore is the sole real party in interest as to those expenses. In support of this assertion, they cite to *Shealy v. Campbell*, 20 Ohio St.3d 23, 485 N.E.2d 701 (1985). In *Shealy*, tortfeasor 1 filed suit against tortfeasor 2 asserting that each was jointly liable for damages to another, McClain, in tort and tortfeasor 1 had paid the entire amount of the judgment to McClain. *Shealy* at 23. Tortfeasor 1 sought contribution from tortfeasor 2 for his proportionate share of the common liability. *Id.*

5

Tortfeasor 2 challenged the action on the grounds that the action was not being prosecuted by the real party in interest as the insurance company which paid the full judgment was the sole real party in interest. *Id.* The Ohio Supreme Court ultimately held that the insurance company who paid the full judgment was the sole real party in interest. *Id.* at 24. The court defined a "real party in interest" as " 'one who has a real interest in the subject matter of the litigation, and not merely an interest in the action itself, *i.e.*, one who is *directly* benefitted or injured by the outcome of the case.' " (Emphasis sic.) *Id.* The court then found, after looking to the substantive law creating the subrogation right of the insurance company, that the insurance company, as the party who paid the entire claim to McClain, was the party possessing a right to be enforced and the only party that would directly be benefited or be injured by the outcome of the suit. *Id.* at 25. The court found this holding to be "in accord with the general rule that a *fully* subrogated insurer is the real party in interest and must bring suit in its own name, for when the loss is fully paid by an insurer and the insurer becomes subrogated to the insured's claim against the wrongdoer, the insured no longer has a right of action against the wrongdoer." (Emphasis added.) *Id.*

{¶11} The difference between *Shealy* and the instant case is that the bounds of liability were firmly established in *Shealy*—as a judgment had already been entered—and therefore, when looking to the insurer's subrogation right, it was clear that tortfeasor 1 had no interest to claim at the time the action was filed as the insurer had paid the entire amount of the loss. Here, the bounds of liability had yet to be established at the time this action was filed. Notably, Mr. Densler's claim for past medical expenses was not limited to the amount ultimately accepted as payment from Medicare by his medical providers. Rather, he was entitled to present a claim to the jury for reasonable medical expenses up to the amount originally billed by his medical

6

providers as permitted in *Robinson*, 112 Ohio St.3d 17, 2006-Ohio-6362, 857 N.E.2d 1195.

{¶12} Defendants point to no authority for the proposition that an insurer—who pays only the portion of the medical expenses ultimately accepted as payment by the health care provider—becomes the sole real party in interest as to a claim for past medical expenses, despite no specific statutory or contractual subrogation provision providing as such. Such a rule would cause a plaintiff to uniformly lose the ability to present a claim for reasonable medical expenses under *Robinson*.

{¶13} Rather, as recognized in *Cleveland Paint & Color Co. v. Bauer Mfg. Co.*, 155 Ohio St. 17, 25, 97 N.E.2d 545 (1951), where an insurer has paid only part of a loss, both the insured and insurer have substantive rights against the tortfeasor, which qualify them as real parties in interest. *Accord, e.g., Johnson v. Stachel*, 2020-Ohio-3015, 154 N.E.3d 577, ¶ 62 (5th Dist.), citing *Cleveland Paint* at 24-25. ("If the insurer has paid only part of a claim, both the insurer and the insured have substantive rights against the tortfeasor which qualify them as real parties in interest."). In other words, where an insurer pays only part of a loss, the insurer and the insured are parties united in interest and both must be joined in the action. *Id.*; *Banford v. State Farm Ins. Co.*, 2d Dist. Montgomery No. 18464, 2001 Ohio App. LEXIS 2752, 16-17 (June 22,2001), citing *Holibaugh v. Cox*, 167 Ohio St. 340, 148 N.E.2d 677 (1958).

{¶14} Because Mr. Densler maintained an interest in his claim for past medical expenses at the time of trial, Medicare was not the sole real party in interest under Civ.R. 17 as to the claim for past medical expenses. Rather, Mr. Densler and Medicare were parties united in interest as to this claim. Beyond that, defendants do not present any challenge to the trial court's joinder determination under Civ.R. 19. Therefore, we hold that the trial court did not err in allowing Mr. Densler to pursue a

claim for past medical expenses at trial. Accordingly, this portion of the assignment of error is overruled. However, for the reasons that follow, we nevertheless hold that a new trial is warranted in this case.

**B. Admission of Improper Evidence Relied Upon by the Jury**

{¶15} Defendants raise several issues for review relating to asserted evidentiary errors made by the trial court which warrant a new trial. Motions for a new trial are governed by Civ.R. 59, which provides, in relevant part, that a new trial may be granted upon any irregularity "in the proceedings of the court, jury, magistrate, or prevailing party, or any order of the court or magistrate, or abuse of discretion, by which an aggrieved party was prevented from having a fair trial." Civ.R. 59(A)(1). "Upon a trial court's denial of a motion for a new trial, 'we "construe the evidence in a light favorable to the trial court's action," ' while applying an abuse of discretion standard of review." *Stephenson v. Durrani*, 1st Dist. Hamilton Nos. C-220020 and C-220036, 2023-Ohio-2500, ¶ 15, quoting *Adams v. Durrani*, 2022-Ohio-60, 183 N.E.3d 560, ¶ 20 (1st Dist.). " 'An abuse of discretion connotes more than a mere error of judgment; rather, "it implies that the court's attitude is arbitrary, unreasonable, or unconscionable." ' " *Id.* at ¶ 16, quoting *Hayes v. Durrani*, 1st Dist. Hamilton No. C-190617, 2021-Ohio-725, ¶ 8. "An abuse of discretion occurs when 'a court exercise[s] its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority.' " *Id.*, quoting *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 35.

{¶16} Defendants first argue that the trial court abused its discretion by admitting the testimony of Dr. Zeeshan Tayeb as his testimony was inadmissible as habit evidence under Evid.R. 406. We review the evidentiary decisions of a trial court

for an abuse of discretion. *Id.* at ¶ 27, citing *State v. White*, 2015-Ohio-3512, 37 N.E.3d 1271, ¶ 36 (2d Dist.).

{¶17} Dr. Tayeb—a physician who previously worked with Dr. Durrani at CAST—testified as follows:

Q: Did you hear that Durrani – Dr. Durrani told her that she could be paralyzed if she did not have this surgery? Was that something that you routinely heard him tell patients?

A: So, again, during the shadowing time, it is something that I did hear here and there, but it was definitely from, again, working with the patients that we shared. That was definitely a phrase that was utilized.

Q: And would Dr. Durrani ever classify surgery as an emergency?

A: Yes, he did.

Q: And when he would classify the surgery as an emergency, would it actually be an emergency?

A: Well, that's a call for a surgeon to make, you know, making statements like a patient's head is going to fall off or they're going to be paralyzed, or, you know, you're not going to be able to walk again or you're going to lose control of your bowel or bladder. These are all, according to basic textbooks, that you have a surgical emergency.

And a lot of those cases, you know, these individuals had been living like this for so long, and, you know, all of a sudden now they see Dr. Durrani and they're being told, you know, something.

And so they were put into a lot of fear essentially. And even when I would see these people afterwards, these unfortunate souls, they would go on and tell me, like, I would have tried this or I would have tried that, but I was essentially told that there was no other way around this, that I have to go down this path or else I'm going to suffer severely down the road.

Q:    And when you reference patients' heads falling off and paralyzed and stuff like that, would the patients at CAST be told that by somebody?

A:    Yes. It was told by Dr. Durrani himself.

Q:    And in your experience, how frequently did that happen?

A:    Well, it happened a fair amount because I would hear this from a number of patients. I mean, even to this day, I follow a couple. I follow a few of these patients, and they still remember those phrases being told to them, you know, about paralysis and/or their heads falling off, and just some of the things we just mentioned previously.

* * *

Q:    Doctor, did Dr. Durrani ever coerce patients into having surgery?

A:    When you tell a person that their head is going to fall off or they're going to be paralyzed or they're not going to walk again or they're going to lose control of their bowel and bladder and pooping and peeing on themselves, I think you're basically telling that person: you need to do this.

* * *

10

Q: And you personally—would you ever hear Dr. Durrani tell a patient those things?

A: I only shadowed him for the first couple weeks, so I was not in the room when those exact statements were said. However, having seen many of the patients during the workup for the surgery or right before surgery or even after surgery, the ones that – whether they were successful or not, when they would come back and say this and I heard the same statements over and over again, that led me to believe that, obviously, these statements were being made.

{¶18} This court recently addressed substantially similar testimony to the testimony now before us in *Stephenson*, 1st Dist. Hamilton Nos. C-220020 and C-220036, 2023-Ohio-2500. We held that the trial court abused its discretion in admitting the testimony as habit evidence as a sufficient foundation was not established for the testimony to be admissible as habit evidence. *Id.* at ¶ 27-37. We reaffirm that position here and hold that the trial court abused its discretion in admitting Dr. Tayeb's testimony for the same reasons provided in *Stephenson*.

{¶19} Nevertheless, " ' "[a]n improper evidentiary ruling constitutes reversible error only when the error affects the substantial rights of the adverse party or the ruling is inconsistent with substantial justice." ' " *Id.* at ¶ 78, quoting *Setters*, 2020-Ohio-6859, 164 N.E.3d 1159, at ¶ 22. " 'In determining whether substantial justice has been done, a reviewing court must weigh the prejudicial effect of the errors and determine whether the trier of fact would have reached the same conclusion had the errors not occurred.' " *Id.*, citing *Setters* at ¶ 22.

{¶20} Here, Dr. Tayeb's testimony was the only testimony which established that Dr. Durrani told his patients that they would lose control of their bodily functions absent surgery. Mr. Densler's testimony was limited to stating that Dr. Durrani told him he would be paralyzed without the surgery. Yet, the jury interrogatories reveal that the jury awarded Mr. Densler punitive damages after finding that Dr. Durrani "acted with malice and aggravated or egregious fraud" by telling Mr. Densler "that he would be paralyzed without the surgery and lose control of bodily functions." Because the record provides clear confirmation that the jury relied on the improperly admitted testimony when making its decision in this case, we cannot say that the jury—as the fact finder—would have reached the same conclusion absent the admission of Dr. Tayeb's testimony. Therefore, we hold that the defendants are entitled to a new trial and the trial court abused its discretion in finding otherwise. Accordingly, the assignment of error is sustained.

{¶21} Because we find that resolution of the first evidentiary issue presented for review is dispositive of this appeal, the remaining evidentiary and trial issues raised by the defendants are now moot and we decline to address them.[3]

---

[3] We note that one of the issues raised by defendants in this case was the trial court's instruction to the jury regarding Dr. Durrani's absence which allowed the jury to "make whatever inferences and conclusions" it found warranted from Dr. Durrani's failure to attend the trial. This court has recently held that such an instruction was an abuse of discretion and that the cumulative effect of the jury instruction with other errors amounted to reversible error. *See Hounchell v. Durrani,* 1st Dist. Hamilton No. C-220021, 2023-Ohio-2501, ¶ 65-70, *appeal not accepted,* ___ Ohio St.3d ____, 2023-Ohio-4410, ___ N.E.2d ___; *Greene v. Durrani,* 1st Dist. Hamilton Nos. C-220023 and C-220037, 2023-Ohio-3069, ¶ 17-18; *Stratman v. Durrani,* 1st Dist. Hamilton Nos. C-220027 and C-220032, 2023-Ohio-3035, ¶ 19-20. Here, based on our resolution, we need not determine whether the jury instruction on its own amounts to reversible error because this issue is mooted by our resolution of this case.

### III. Conclusion

**{¶22}** For all the foregoing reasons, we sustain the sole assignment of error, reverse the trial court's judgment, and remand the cause for a new trial on the fraudulent-misrepresentation claim consistent with this opinion and the law.

Judgment reversed and cause remanded.

**BOCK, J.,** concurs.
**BERGERON, J.,** concurs separately**.**

**BERGERON, J.,** concurring separately.

**{¶23}** I concur in the majority's judgment reversing this cause for a new trial, but I write separately because I would reverse on the additional ground that the trial court abused its discretion by denying defense counsel an opportunity to cross-examine Mr. Densler about a prior inconsistent statement.

**{¶24}** At trial, Mr. Densler's counsel asked him to explain his initial consult with Dr. Durrani: "Can you tell me what happened at that first visit?" In his response, he shared his recollections of first seeing Dr. Durrani, including this critical point: "[Dr. Durrani] told me that I would be paralyzed" if he did not have surgery on his back. That fact proved to be a crucial one for the jury, as noted in the majority opinion.

**{¶25}** But the trial court unfairly cut off cross-examination on this point that would have allowed defense counsel to test the accuracy of Mr. Densler's recollection. After he repeated Dr. Durrani's paralysis warning on cross-examination, defense counsel queried, "By the way, you never testified to that in your deposition at all, did you?" The trial court sustained an objection from Mr. Densler's counsel and struck the question. Based on my review of the record, this is inconsistent with the requirements and purpose of Evid.R. 613(B).

13

{¶26} Evid.R. 613(B) allows a party to introduce extrinsic evidence, such as a deposition transcript, of a testifying witness's prior inconsistent statement so long as proper foundation is laid and the witness receives an opportunity to explain the inconsistency. Evid.R. 613(B); *Garry v. Borger*, 1st Dist. Hamilton No. C-220069, 2023-Ohio-905, ¶ 29. Looking at the above-quoted question and answer in a vacuum, it might not appear that such a foundation was laid. But as one flips a few pages earlier in the trial transcript, Dr. Durrani's counsel laid the requisite foundation for introducing statements from the deposition, identifying the date and circumstances of the deposition and establishing that Mr. Densler remembered giving it and taking an oath to tell the truth. Defense counsel proceeded to ask several questions based on Mr. Densler's deposition testimony, highlighting inconsistencies and at times reading questions and answers directly from the deposition transcript. Apart from the question about the "paralyzed" comment and a couple of brief instances where the court limited the questioning, the trial court allowed most, if not all, of defense counsel's impeachment efforts relying on the deposition transcript.

{¶27} It is unclear why the trial court refused the question at issue in light of the string of impeachment queries leading up to that point. Reading the transcript in context, there is no question that the purpose of asking Mr. Densler about omitting the "paralyzed" comment in his deposition was impeachment. The witness was on the stand and had the chance to explain or deny the omission. And his counsel had the opportunity to ask him about it on redirect examination, because he had not yet been dismissed. Further, defense counsel presented the witness with the prior statement by laying the foundation about the deposition and asking him multiple questions about it. Counsel also asked whether he made the statement and remembered giving it, which he did and confirmed. *See* Civ.R. 32(A)(1) ("Any deposition may be used by

any party for the purpose of contradicting or impeaching the testimony of deponent as a witness.").

{¶28} I conclude there was an inconsistency between Mr. Densler's trial testimony stating that Dr. Durrani told him he would be paralyzed without surgery and his deposition testimony in which he never recites such an admonition. During the deposition, counsel repeatedly probed about the contents of his conversations with Dr. Durrani prior to agreeing to the surgery:

Do you remember anything you discussed with him?

When you had that first visit with Dr. Durrani you went through with him everything that had led up to that point and why you were coming to see him; is that fair?

And what did he say about any kind of treatment plan or what did he recommend?

[A]nd he said he had a long chat with you about what you were going to do, about what he was recommending for you? * * * Do you remember him talking about that with you?

He went over the benefits and risks of the surgery with you at that time; is that fair?

{¶29} Mr. Densler at no point mentioned that Dr. Durrani told him he would be paralyzed without surgery, despite multiple opportunities to respond to these prompts about their presurgery consultations. By then recalling the "paralyzed" comment at trial nine years later, in response to an open-ended question about his first meeting with Dr. Durrani resembling questions asked at his deposition, Mr. Densler's testimony was inconsistent within the meaning of Evid.R. 613(B). Blocking cross-examination about this inconsistency unfairly tips the scales here because it

concerns a dramatic, highly prejudicial comment that appears to have influenced the jury to conclude that Dr. Durrani perpetrated a fraud. It was an abuse of discretion for the trial court to not allow defense counsel to interrogate him about it. The jury should have had the opportunity to sort through these disparate statements and evaluate credibility accordingly.

{¶30} In addition to the improper testimony by Dr. Tayeb and the jury instruction issue mentioned in the majority's footnote, I would reverse on this ground as well.

Please note:

The court has recorded its own entry this date.