**[Cite as *Potts v. Durrani*, 2023-Ohio-4195.]**

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

|  |  |  |
|---|---|---|
| CHERYL MARIE POTTS, Individually and as Executrix of the Estate of Jeffrey Potts, | : | APPEAL NOS.C-220024 |
|  |  | C-220034 |
|  | : | TRIAL NO. A-1206877 |
| Plaintiff-Appellee/Cross-Appellant, | : | *O P I N I O N.* |
|  | : |  |
| vs. | : |  |
|  | : |  |
| ABUBAKAR ATIQ DURRANI, M.D., | : |  |
| and | : |  |
| THE CENTER FOR ADVANCED SPINE TECHNOLOGIES, INC., | : |  |
| Defendants-Appellants/Cross-Appellees. | : |  |
|  | : |  |

Civil Appeals From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed in Part, Reversed in Part, and Cause Remanded in C-220024; Appeal Dismissed in C-220034

Date of Judgment Entry on Appeal: November 22, 2023

*Robert A. Winter Jr., James F. Maus* and *Benjamin M. Maraan, II,* for Plaintiff-Appellee/Cross-Appellant,

*Taft Stettinius & Hollister LLP, Aaron M. Herzig, Russell S. Sayre, Philip D. Williamson, Anna M. Greve, David C. Roper, Lindhorst & Dreidame Co., L.P.A., Michael F. Lyon, James F. Brockman* and *Paul J. Vollman,* for Defendants-Appellants/Cross-Appellees.

**CROUSE, Presiding Judge.**

{¶1} Defendants-appellants Abubakar Atiq Durrani, M.D., and the Center for Advanced Spine Technologies, Inc., ("CAST") (collectively, "appellants") appeal the trial court's judgment entered in favor of plaintiff-appellee Cheryl Marie Potts individually and as Executrix of the Estate of Jeffrey Potts ("appellee") following a jury trial.[1]

{¶2} In two assignments of error, appellants contend that the trial court should have granted their motion for a new trial due to a host of evidentiary issues, and that the damages award is erroneous. For the reasons that follow, we hold that the evidentiary issues identified by appellants were harmless, but we agree that the trial court erred in its award of prejudgment interest and court costs. Accordingly, we affirm the trial court's judgment in part, reverse it in part, and remand the cause for the trial court to recalculate the damages award.

### I. Factual and Procedural Background

{¶3} Jeffrey Potts was a patient of Dr. Durrani. Throughout his adult life, Mr. Potts dealt with back and leg pain stemming from a football injury in the 1980s. Prior to seeing Dr. Durrani, he had a laminectomy in 1982 and 1991, and a posterior spinal fusion in 1994. After his 1994 surgery, Mr. Potts managed his pain through non-surgical means, including physical therapy, injections, and prescribed pain medication. In 2010, Mr. Potts went to CAST to see Dr. Zeeshan Tayeb, a pain-management specialist. Dr. Tayeb recommended additional nonsurgical interventions and sent Mr. Potts to get an MRI. Soon after his visit with Dr. Tayeb, Mr. Potts received

---

[1] Pursuant to Civ.R. 25, Cheryl Potts was substituted for plaintiff Jeffrey Potts on January 15, 2021, due to Mr. Potts's death in December 2020. Mrs. Potts was also a named plaintiff in the complaint.

2

a phone call from Dr. Durrani. Mr. Potts testified that Dr. Durrani told him on that phone call that "we had to go in and see him right away." Mr. and Mrs. Potts met with Dr. Durrani to review the findings of his MRI. Mr. Potts alleged that during that appointment, Dr. Durrani misread the MRI and exaggerated the findings to justify an additional surgery on his lumbar spine. Mr. Potts testified that Dr. Durrani assured both him and his wife that surgery would "absolutely take care of [his] pain a hundred percent."

{¶4} On October 15, 2010, Dr. Durrani performed a laminectomy, foraminotomy, and a direct lateral interbody fusion ("DLIF") on Mr. Potts. Dr. Durrani also performed a dural repair to address a dural tear that occurred during the surgery. After the surgery, Mr. Potts claimed that his pain was significantly worse. He remained in the hospital until October 18. The day after his discharge, he returned to the emergency room for a spiked fever, intense pain, and complications with his abdomen, including fecal material seeping through his incision site. He was diagnosed with sepsis and underwent surgery to repair his colon. Doctors removed a portion of his colon. The operative report explained that Mr. Potts had a "[t]hrough-and-through ascending colon injury from trocar placement." Dr. Stephen Bloomfield explained in his testimony that trocars are instruments used during spine surgery for radiologic imaging purposes and that he was "convinced" that the injury occurred during Dr. Durrani's surgery. After surgery, Mr. Potts's left lung collapsed and he developed a bone infection. He remained in the hospital for these complications until November 12, 2010. Mr. Potts subsequently developed breast cancer, though his legal claims do not allege that the surgery led to his cancer diagnosis.

{¶5}   On August 29, 2012, Mr. and Mrs. Potts filed suit against Dr. Durrani and CAST asserting various claims, including medical negligence, failure to obtain informed consent, battery, fraud, and loss of consortium.[2] The case proceeded to a jury trial in July 2019.

{¶6}   On August 1, 2019, the jury returned verdicts in favor of Mr. and Mrs. Potts, concluding that Dr. Durrani was negligent in the care and treatment of Mr. Potts, failed to obtain informed consent, committed battery by performing the surgery, and fraudulently misrepresented the need for surgery. The jury also found that Mr. Potts suffered a catastrophic injury under R.C. 2323.43(A)(3). In addition, the jury awarded attorney fees to Mr. and Mrs. Potts. The jury's damage award included over $9 million in compensatory damages, $26 million in punitive damages, and $4 million for Mrs. Potts's loss-of-consortium claim.

{¶7}   On October 11, 2019, appellants filed a motion for judgment notwithstanding the verdict, and/or in the alternative a new trial, and/or in the alternative for a remittitur ("JNOV/new-trial motion"). On June 26, 2020, the court denied the motion.

{¶8}   On October 21, 2020, the court entered judgment for Mr. and Mrs. Potts. On November 16, 2020, appellants filed a notice that purported to refile their previously-filed JNOV/new-trial motion.

{¶9}   On December 14, 2021, after additional post-trial motion practice, the court entered final judgment, and in a companion entry, summarized its decision on the various issues raised by appellants. The court reduced the total compensatory

---

[2] The complaint was originally filed in Butler County, but was later dismissed.

damages award from $9,146,091.53 to $1,299,588.92. This reduction included a reduction in noneconomic damages from $8 million to $500,000 to conform with the statutory cap. The court reduced damages for past medical expenses from $746,091.53 to $404,378.65. The court also granted a setoff of $2,049.73 for appellants against the judgment rendered against them. The court reduced the punitive damages award to $350,000, and awarded $71,259.50 in attorney fees and $420,632.72 in prejudgment interest. The damages award for Mrs. Potts's loss-of-consortium claim was reduced to $250,000. Finally, the court ordered appellants to pay $3,638.50 in court costs.

{¶10} On January 12, 2022, appellants timely appealed. Appellee subsequently filed a cross-appeal but did not raise any cross-assignments of error in her brief. Accordingly, the appeal numbered C-220034 is dismissed. *See State v. Harris,* 2017-Ohio-5594, 92 N.E.3d 1283, ¶ 43 (1st Dist.) ("[T]o receive consideration on appeal, trial court errors must be raised by assignment of error and must be argued and supported by legal authority and citation to the record.").

## *II. First Assignment of Error: The Trial*

{¶11} In their first assignment of error, appellants argue that the trial court should have granted their motion for a new trial. Pursuant to Civ.R. 59(A), a new trial may be granted "for, among other things, an irregularity in the proceedings of the court, if the judgment is not sustained by the weight of the evidence, or any reason 'for good cause shown.' " *Adams v. Durrani*, 2022-Ohio-60, 183 N.E.3d 560, ¶ 20 (1st Dist.). When this court reviews a trial court's denial of a motion for a new trial, it " 'construe[s] the evidence in a light favorable to the trial court's action rather than to the original jury's verdict.' " *Id.,* quoting *Kreller Group, Inc. v. WFS Fin., Inc.*, 155 Ohio App.3d 14, 2003-Ohio-5393, 798 N.E.2d 1179, ¶ 30 (1st Dist.). We review for an abuse

5

of discretion and will only reverse where the ruling was unreasonable, arbitrary, or unconscionable. *Id.*

**{¶12}** Appellants insist that certain testimony and comments from opposing counsel were erroneously admitted, that expert testimony was improper, and that the cumulative effect of these errors requires a new trial.

## A. License Revocation and Comments at Trial

**{¶13}** Appellants first contend that the trial court violated Evid.R. 403(A) and 404(B) by allowing certain comments from the Pottses' counsel, primarily during voir dire, opening statement, and closing argument.

**{¶14}** Evid.R. 403(A) prohibits the admission of evidence if its "probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." The trial court has "broad discretion" in deciding whether to admit evidence under Evid.R. 403(A). *Setters v. Durrani*, 2020-Ohio-6859, 164 N.E.3d 1159, ¶ 14 (1st Dist.) (hereinafter *"Setters I")*, quoting *Cincinnati v. Triton Servs.*, 2019-Ohio-3108, 140 N.E.3d 1249, ¶ 45 (1st Dist.).

**{¶15}** Evid.R. 404(B) provides that "[e]vidence of any other crime, wrong or act is not admissible to prove the person's character in order to show that on a particular occasion the person acted in accordance with the character," but that such evidence may "be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."

**{¶16}** Opening statements and closing arguments are not evidence. *See Capeheart v. O'Brien*, 1st Dist. Hamilton No. C-040223, 2005-Ohio-3033, ¶ 6; *Burns v. Adams*, 4th Dist. Scioto No. 12CA3508, 2014-Ohio-1917, ¶ 65. Thus, counsel is

6

generally afforded "wide latitude" in opening statement and closing argument, though this is not without its limits. *Viox v. Weinberg*, 169 Ohio App.3d 79, 2006-Ohio-5075, 861 N.E.2d 909, ¶ 35 (1st Dist.), citing *Pesek v. Univ. Neurologists Assn.*, 87 Ohio St.3d 495, 501, 721 N.E.2d 1011 (2000); *Capeheart* at ¶ 7.

{¶17}  A trial court's evidentiary ruling "constitutes reversible error only when the error affects the substantial rights of the adverse party or the ruling is inconsistent with substantial justice." *Setters I,* 2020-Ohio-6859, 164 N.E.3d 1159, at ¶ 22, quoting *Beard v. Meridia Huron Hosp.*, 106 Ohio St.3d 237, 2005-Ohio-4787, 834 N.E.2d 323, ¶ 35. To make that determination, we "must weigh the prejudicial effect of the errors and determine whether the trier of fact would have reached the same conclusion had the errors not occurred." *Id.* Pursuant to Civ.R. 61, should we determine that the same outcome would have been reached had the error not occurred, we deem the error harmless.

{¶18}  First, appellants contend that it was unfairly prejudicial for opposing counsel to reference the permanent revocation of Dr. Durrani's medical license during the trial. In *Setters I,* this court held that, "[i]n a medical-malpractice case, evidence that a defendant-doctor's medical license was revoked is by its very nature prejudicial. It predisposes the jury to find that the doctor acted outside acceptable bounds of competence." *Setters I* at ¶ 20. However, this does not necessarily equate to unfair prejudice. *Id.* We must examine the context to determine how the evidence was used, and whether it was presented to encourage the fact-finder to draw an improper inference. For instance, in *Setters I,* evidence of Dr. Durrani's license being revoked was mentioned on only three occasions: once during opening and closing, and in two identical questions on cross-examination. *Id.* at ¶ 24. We held the error harmless

"[g]iven the significance of the other evidence, the limited nature of the disclosure, and the otherwise lengthy impeachment of Durrani's credibility." *Id.* at ¶ 26.

{**¶19**} We recently explained in *Stephenson v. Durrani*, 1st Dist. Hamilton Nos. C-220020 and C-220036, 2023-Ohio-2500, ¶ 44-46, that based on *Setters I,* the trial court abused its discretion in admitting evidence of license revocation included in a so-called "collage" of Dr. Durrani's video depositions. We reasoned that, unlike *Setters I*, the evidence of license revocation was much more significant in the *Stephenson* trial, and that it was "designed to lead the jury to draw negative conclusions about [Durrani's] abilities as a surgeon." *Id.* at ¶ 46.

{**¶20**} However, the collage at issue in *Stephenson* is not at issue in this case.[3] Rather, appellants take issue with references to the revocation of Dr. Durrani's license during voir dire ("You're also going to learn in 2013/2014 he lost his Ohio license to practice medicine and his Kentucky license.") and during opening statement ("and then his Ohio and Kentucky license [sic] were permanently revoked"). Appellants have not drawn our attention to any other instances where the license revocations were mentioned during the trial. Thus, this case is more like *Setters I* than it is *Stephenson*: the reference was made only twice during a week-long trial, in which substantial competent evidence was presented to support the jury's verdict, including other evidence that shed light on Dr. Durrani's credibility. Accordingly, we hold that any error in the admission of these statements was harmless.

---

[3] There is no indication in the record that the collage was played during the trial, even though after this case was submitted, the parties stipulated to a version of the collage that they claim was played during the trial. Notably, appellants have not assigned error to the admission of the collage, nor did they draw our attention to any erroneous material within the collage. In fact, appellants represented at oral argument and in their reply brief that the collage was *not* introduced during the trial. For these reasons, our analysis is based not on the collage, but on those portions of the record to which appellants have drawn our attention in their brief. *See* App.R. 16(A)(7).

{¶21} Next, appellants insist that the trial court erred by allowing the jury to hear "evidence that the Pottses' counsel deposed Dr. Durrani about a dismissed assault charge brought by his ex-wife." Appellants argue that this prejudice was compounded when counsel referenced other malpractice suits against Dr. Durrani. In support of their argument, appellants reference portions of the record that do not seem to exist.[4] A diligent search of the record does not reveal the complained-of errors. Pursuant to App.R. 16(A)(7), we disregard this portion of appellants' argument.

{¶22} Appellants also take issue with several comments made by opposing counsel during closing argument. They argue counsel for Mr. Potts improperly alluded to other malpractice suits filed against Dr. Durrani by commenting that he "likes to do surgery to fix people. And he gave them hope that caused them, based upon this severity, to jump right in and rely upon it." Appellants do not explain, and we fail to see, how this comment alluded to other malpractice suits. Moreover, appellants do not explain how this comment violated the rules of evidence.

{¶23} Appellants assign error to other portions of the closing argument as well, including opposing counsel's reference to Dr. Durrani's diagnoses as "outright lies," criticisms of the defense strategy, a suggestion that Dr. Durrani could not find local expert witnesses to testify in his defense, and a comment about Dr. Durrani's absence from trial. Appellants did not raise objections when these comments were made, so any potential error is waived. *See Hounchell v. Durrani*, 1st Dist. Hamilton No. C-220021, 2023-Ohio-2501, ¶ 63, citing *Adams,* 2020-Ohio-60, 183 N.E.3d 560, at ¶ 39.

---

[4] Mrs. Potts highlighted this error in her appellate brief, and yet appellants failed to address it in their reply brief.

## B. Dr. Wilkey's Testimony

**{¶24}** We next turn to appellants' contention that testimony from one of the Pottses' expert witnesses, Dr. Keith Wilkey, unfairly prejudiced the jury by referencing Mr. Potts's post-surgery cancer diagnosis, in violation of the court's pretrial order.

**{¶25}** The trial transcript reveals that Dr. Wilkey's video deposition was played for the jury. However, the court reporter did not transcribe what was played. At some point, the court stopped the video deposition and stated to the parties, "I'm sure that wasn't supposed to be there. I don't know what else to do but to take a break and figure this out." The court then dismissed the jury.

**{¶26}** After an off-the-record discussion, the court stated on the record:

[W]e had a portion of the video that should have been edited out where Dr. Wilkey was referencing the Affidavit of Merit that he prepared in this case. It was just a piece of it, and the Affidavit was – appeared on the screen.

I don't know that it was legible and large enough for the jury to read. However, we stopped the video, gave the audiovisual person an opportunity to make some repairs and then we came back into the courtroom.

Before the video was restarted, I gave the jury an instruction that they should disregard the last few seconds of the video before I stopped it, and then we proceeded to play the video again.

Now, we've recently reached a point where there was another problem with the video with edits not being removed or at least appearing on the screen, and we stopped the video again.

10

I've asked the audio/visual person to try to repair the entire transcript – or the entire video so that we don't have this problem again for the remainder.

**{¶27}** After discussion outside of the jury's presence, appellants moved for a mistrial and argued they were unfairly prejudiced. The court denied the motion for a mistrial and instructed the jury as follows:

Prior to this trial, the parties stipulated that there would be no claims related to the plaintiff's cancer, and it is not part of this case. In the video that was played before lunch, Dr. Wilkey made a statement regarding cancer that was supposed to be edited out. The statement is not relevant to this case, and you shall not consider it for any purpose.

**{¶28}** As stated above, the court reporter did not transcribe Dr. Wilkey's video deposition that was played for the jury. Instead, a transcript of Dr. Wilkey's deposition is in the record, which includes several references to Mr. Potts's cancer diagnosis. However, the on-the-record discussion and the provided jury instruction only reference one statement about cancer that was played for the jury. Furthermore, the only statement appellants specifically quote in their brief is the following: "And then finally this patient had a medicine called Infuse used. And that caused other problems, such as his subsequent breast cancer."

**{¶29}** The record suggests that after the judge stopped the video and admonished the jury, an edited version of Dr. Wilkey's video deposition, without any other cancer references, was played for the jury. Thus, we presume that the jury heard just one of Dr. Wilkey's cancer comments and the transcript in the record is the unedited version that contains multiple references to cancer.

11

**{¶30}** Appellants argue that the curative instruction notwithstanding, the jury erroneously relied on Dr. Wilkey's cancer comment in returning its verdict and in awarding punitive damages.

**{¶31}** While we agree that the portion of the deposition discussing cancer should not have been played, the trial court appropriately handled the issue. The video was immediately stopped, and the jury was instructed accordingly. Courts consistently presume curative instructions to be effective. *See Hippely v. Lincoln Elec. Holdings, Inc.,* 8th Dist. Cuyahoga No. 96439, 2011-Ohio-5274, ¶ 18; *State v. Zuern*, 32 Ohio St.3d 56, 61, 512 N.E.2d 585 (1987) ("To assert that the jury was hopelessly prejudiced by" a witness's inadmissible comment "undermines the presumption of the effectiveness of the trial court's curative instructions, [and] calls into question the effectiveness of the jurors' oaths."). Moreover, Mr. and Mrs. Potts never attempted to link the cancer diagnosis to the surgery or to any of the claims, and the jury did not mention cancer in any of the jury interrogatories. Appellants have not demonstrated that, but for this comment, the jury would not have reached the same result. For these reasons, we hold that any error in the admission of the cancer testimony was harmless.

**{¶32}** Appellants also take issue with Dr. Wilkey's alleged speculation on Dr. Durrani's character, including allegations that Dr. Durrani was a liar and a fraud. We confronted nearly this exact issue in *Adams*, 2022-Ohio-60, 183 N.E.3d 560, at ¶ 36. In *Adams,* this court stated, "[i]t is clear from Wilkey's testimony that he disliked Durrani on a personal level, and nothing in this opinion should condone the ad hominem attacks in his testimony." *Id.* at ¶ 38. Nevertheless, we held that there was no abuse of discretion in admitting the testimony because it related to the patient-

plaintiff's "claim that Durrani fraudulently misrepresented the nature of her condition and the necessity of surgery." *Id.*

**{¶33}** The same is true here. We recognize that Dr. Wilkey's comments could be read to suggest a personal disdain for Dr. Durrani, but appellants have not demonstrated that they rise to the level of reversible error. In fact, the majority of Dr. Wilkey's comments that used the word "lie," related to the claim that Dr. Durrani fraudulently misrepresented Mr. Potts's need for surgery. ("I believe this person has been lied to, and the reason that Dr. Durrani lied was so that he could operate on this patient.") Therefore, we hold the court did not abuse its discretion in admitting the complained-of portions of Dr. Wilkey's testimony. To the extent that any comments were unrelated to Mr. Potts's claim for fraudulent misrepresentation, we hold any error in their admission was harmless.

### C. Dr. Saini's Testimony

**{¶34}** We next consider appellants' argument that one of the Pottses' experts, Dr. Ranjiv Saini, went beyond the scope of his expertise as a radiologist, by opining on the need for surgery and the surgery's associated complications. Appellee counters by pointing to this court's decision in *Adams* for the proposition that an expert witness does not need to practice in the exact specialty of the defendant-physician to qualify as an expert.

**{¶35}** "It is a general rule that the expert witness is not required to be the best witness on the subject." *Alexander v. Mt. Carmel Med. Ctr.*, 56 Ohio St.2d 155, 159, 383 N.E.2d 564 (1978). In *Adams,* this court held that the trial court did not err in admitting Dr. Saini's expert testimony about the necessity of the surgery and Dr. Durrani's informed consent. *Adams*, 2020-Ohio-60, 183 N.E.3d 560*,* at ¶ 57, 60. The

13

court reasoned that "[w]here 'fields of medicine overlap and more than one type of specialist may perform the treatment, a witness may qualify as an expert even though he does not practice the same specialty as the defendant.' " *Id.* at ¶ 51, quoting *Alexander* at 158. For radiologists like Dr. Saini, and orthopedic surgeons like Dr. Durrani, this overlap includes at least the standard of care in reviewing diagnostic images and deciding whether that image indicates a need for surgery. *Id.* at ¶ 55, 57. And where certain issues, like informed consent, cut across all specialty areas, any trained medical doctor regardless of specialty, could be qualified to testify. *Id.* at ¶ 60.

{¶37} Appellants distinguish Dr. Saini's testimony in this case from the testimony in *Adams* by arguing that Dr. Saini's "testimony went far beyond the implications of Mr. Potts's MRI and included his opinions on Dr. Durrani's clinical evaluation of Mr. Potts and the quality of the surgery[.]"[5]

{¶38} Dr. Saini testified that Dr. Durrani's reading of the MRI was exaggerated and, in certain instances, incorrect. Dr. Saini also testified about the shortcomings of the consent form and that the surgery's complications were not adequately communicated. This testimony fits squarely within the framework we provided in *Adams*. We hold there was no error in admitting this portion of his testimony.

{¶39} However, Dr. Saini also testified that a dural tear occurred during Mr. Potts's surgery because Dr. Durrani was being "too aggressive." He suggested that Dr. Durrani's technique caused the bowel perforation, testifying that Dr. Durrani used a "nonstandard technique" by placing Mr. Potts with his right side up during surgery, which is "exactly where they're saying the that the trocar hit." We agree that this

---

[5] Appellants also argue that Dr. Saini was testifying based on incomplete information. However, this issue has been waived because they did not object on this basis at trial.

testimony from Dr. Saini goes beyond a radiologist's area of expertise and is not the type of basic medicine that all physicians are qualified to testify about. The court erred in admitting it.

{¶40} But testimony from the Pottses' other experts indicated that the actual performance of the surgery was not problematic. Dr. Stephen Bloomfield testified that neither the dural tear nor the colon puncture would have been a breach of the standard of care had the surgery been medically indicated. Dr. Wilkey opined that the dural tear and corresponding repair was a normal complication of surgery. Furthermore, in closing arguments, counsel for appellee did not discuss the dural tear or the colon puncture issues at all. Instead, counsel focused on whether Dr. Durrani *misrepresented* the need for surgery—not whether he *botched* the surgery. Thus, because Dr. Saini's erroneous expert testimony was sparse, was balanced with other expert testimony suggesting the surgery itself was performed properly, and was not raised again by Mr. Potts, we hold that this error was harmless.

### D. Cumulative Error

{¶41} Appellants argue that the cumulative effect of these evidentiary errors warrants a new trial. This court has recognized that the cumulative-error doctrine applies in civil cases where there are multiple instances of harmless error. *Setters I,* 2020-Ohio-6859, 164 N.E.3d 1159, at ¶ 60. Under the doctrine, " 'a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal.' " *State v. Leach*, 150 Ohio App.3d 567, 2002-Ohio-6654, 782 N.E.2d 631, ¶ 57 (1st Dist.), quoting *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995).

15

{**¶42**}  In this case, despite identifying multiple instances of harmless error, appellants have failed to demonstrate that these errors, even when considered together, deprived them of a fair trial. Dr. Wilkey's comments about Dr. Durrani's untruthfulness related to Mr. Potts's fraud claim and his single comment about cancer was cured with an instruction. Dr. Saini's testimony veered beyond the bounds of his expertise, but his two erroneous comments were counterbalanced by other expert testimony. The license revocation was only referenced in voir dire and opening statement, and Mr. Potts's attacks on Dr. Durrani's credibility in closing arguments avoided the license-revocation issue entirely.

{**¶43**}  Accordingly, we overrule the first assignment of error.

### III. Second Assignment of Error: Damages

{**¶44**}  In appellants' second assignment of error, they take issue with six different parts of the damages award: the setoff, the statutory damages cap, past and future damages, prejudgment interest, and court costs. They contend that this court should remand the cause to the trial court with instructions to correct the damages award.

{**¶45**}  "The assessment of damages is a function that falls squarely within the jury's purview, and on appeal we will not substitute our judgment for that of the jury." *Hollingsworth v. Time Warner Cable,* 168 Ohio App.3d 658, 2006-Ohio-4903, 861 N.E.2d 580, ¶ 48 (1st Dist.). Yet, where the calculation of damages involves issues of law, such as the application of a statute, we review de novo. *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 38 (holding that "courts apply a de novo standard when reviewing issues of law").

16

**A. The Setoff**

**{¶46}** The first damages-related issue for our review concerns the setoff. Generally, a nonsettling party is entitled to a setoff under R.C. 2307.28 when a settling defendant is liable for any of the tort plaintiff's damages. *See Setters I,* 2020-Ohio-6859, 164 N.E.3d 1159, at ¶ 62. Here, the trial court granted appellants a setoff in the amount of $2,049.73. But appellants contend that the court erred in not allowing them to view the settlement agreements. They rely on this court's decision in *Setters v. Durrani,* 1st Dist. Hamilton Nos. C-210428 and C-210437, 2022-Ohio-1022, ¶ 28-32 (hereinafter "*Setters II*") for the proposition that they "have a due process right to notice of the evidence supporting the set-off amount and a meaningful opportunity to object to it." Appellee argues that appellants are not entitled to a setoff at all. However, appellee has not cross-appealed on this issue. Appellants assign error only to the trial court's refusal to allow them to view the settlement agreements.

**{¶47}** Once a trial court determines that a setoff is appropriate, it looks to the settlement agreements between the plaintiffs and the settling defendants to determine the proper amount to credit. In *Setters II,* we held that to make this determination, a trial court cannot simply "accept[] the amount provided by plaintiffs' counsel and counsel for [the settling defendants] without independently verifying its accuracy or allowing defendants to test its accuracy." *Setters II* at ¶ 31. We made clear that "[t]here are multiple methods which, either employed together or standing alone, may be sufficient for due-process purposes, such as an in camera inspection, protective order, and/or filing a redacted version of the settlement agreement under seal." *Id.* at ¶ 32. We left open the question of "whether defendants should have access to the entire settlement agreement." *Id.*

17

**{¶48}** Here, the trial court ordered the Pottses to submit, for an in camera review, the amounts they received from the settlement agreements, in addition to all settlement agreements, releases, and other documents evidencing settlements "from any source that relates to the care and treatment Plaintiff[] received which is the subject of th[is] lawsuit[]."[6] The record demonstrates that the court received those amounts and documents, conducted the in camera review, and determined that a setoff of $2,049.73 was appropriate. Rather than relying solely on counsel's representations as the trial court did in *Setters II*, the court was able to independently verify the amounts received to determine an appropriate amount for setoff. Appellants have not demonstrated that the trial court's in camera review was insufficient, nor did they provide this court with any reason to believe that the trial court's setoff determination was inaccurate. Appellants simply argue that they must always be permitted to view the settlement agreements in order to determine whether the trial court's setoff determination is accurate. As set forth in *Setters II*, we decline to state such a blanket rule.

**{¶49}** There is nothing in the record to indicate that the trial court failed to review the documents to the extent necessary to arrive at the proper setoff amount. Accordingly, we hold that the trial court did not err in failing to disclose the settlement agreements.

---

[6] After the court ordered the Pottses to make that submission, appellants filed a motion for disclosure of the settlement agreements wherein they argued, as they do here, that such a procedure would not provide them the opportunity to review the agreements and/or to present arguments as to the proper setoff amount. The settling defendants opposed the disclosure. The record before us does not make clear whether the trial court ever ruled on this motion.

### B. Catastrophic Injury

**{¶50}** Next, appellants contend that the trial court erred in applying the heightened cap for noneconomic damages because there was insufficient evidence to demonstrate that Mr. Potts suffered a catastrophic injury. Appellants seek a remittitur for the court to apply the reduced cap of $350,000. Appellee argues that the jury was presented with conflicting evidence on the matter and there is no reason to disturb the factual findings of the jury.

**{¶51}** Generally, the recovery of *economic* damages in medical malpractice cases is unlimited. R.C. 2323.43(A)(1). However, the recovery of *noneconomic* damages is limited to the greater of $250,000 or three times the plaintiff's economic loss, not to exceed $350,000 for each plaintiff, or $500,000 for each occurrence. R.C. 2323.43(A)(2). Where a plaintiff suffers a certain type of injury, commonly known as a "catastrophic injury," the limit is raised to $500,000 for each plaintiff or $1,000,000 for each occurrence. R.C. 2323.43(A)(3); *Setters I,* 2020-Ohio-6859, 164 N.E.3d 1159, at ¶ 31. The statute provides that the heightened cap applies where the noneconomic losses are for either: "(a) Permanent and substantial physical deformity, loss of use of a limb, or loss of a bodily organ system; [or] (b) Permanent physical functional injury that permanently prevents the injured person from being able to independently care for self and perform life sustaining activities." R.C. 2323.43(A)(3)(a)-(b). *See generally Setters I* at ¶ 31.

**{¶52}** In applying this cap, the trial court's role is to "determine whether there is enough evidence to meet the basic evidentiary threshold." *Fairrow v. OhioHealth Corp.*, 10th Dist. Franklin No. 19AP-828, 2020-Ohio-5595, ¶ 68. "Once that threshold is met, it is for the trier of fact, not the court, to determine whether" the plaintiff's

19

damages are the sort provided in the statute. *Id*; *accord Arbino v. Johnson & Johnson,* 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, ¶ 41, quoting *Estate of Sisk v. Manzanares,* 270 F.Supp.2d 1265, 1277-1278 (D.Kan.2003) (explaining that the trial court does not "impose its own factual determination regarding what a proper award might be"); *Ohle v. DJO, Inc.,* N.D.Ohio No. 1:09-cv-02794, 2012 U.S. Dist. LEXIS 140020, 8 (Sept. 28, 2012) ("[T]he court's fact-finding role is limited to the threshold determination of whether there is sufficient evidence to submit the issue of the nature of the injury to the jury."). We review a trial court's decision to submit a jury interrogatory for an abuse of discretion. *Fairrow* at ¶ 65, 78 (holding that the trial court did not abuse its discretion in submitting catastrophic-damages issue to jury).

**{¶53}** In this case, the jury found that Mr. Potts suffered a "permanent physical functional injury that permanently prevents Jeff Potts from being able to care for himself and perform life-sustaining activities" under R.C. 2323.43(A)(3)(b). The statute does not define "permanent physical functional injury" or "life sustaining activities."

**{¶54}** Examples of injuries that qualify under R.C. 2323.43(A)(3)(b) are sparse, but the Tenth District provided some guidance in *Dillon v. OhioHealth Corp.*, 2015-Ohio-1389, 31 N.E.3d 1232 (10th Dist.). In *Dillon*, the court was focused on whether the plaintiff-patient was prevented from performing "life-sustaining activities." *Id*. at ¶ 52. In that case, the evidence at trial showed that the plaintiff could not walk significant distances, and could not bathe, do tasks around the house, or get to the bathroom on his own. *Id*. at ¶ 56. The court held that this evidence was sufficient to overcome a directed verdict on the catastrophic-injury issue.

{¶55} Federal courts have analyzed the issue as well, though under R.C. 2315.18(B), the catastrophic-injury statute for tort actions generally. In one such case, *Sheffer v. Novartis Pharmaceuticals Corp.*, S.D.Ohio No. 3:12-cv-238, 2014 U.S. Dist. LEXIS 184614 (July 14, 2014), the Southern District of Ohio held that a plaintiff's jaw injury was insufficient as a matter of law to be considered a permanent physical functional injury under R.C. 2315.18(B)(3)(b). *Id.* at 7. In that case, the plaintiff alleged that her use of a prescription drug caused her to develop osteonecrosis of the jaw. *Id.* at 1. Notably, the plaintiff did not put forth any evidence to support her contention that her injury was catastrophic under either exception. *Id.* at 4. The court looked to the deposition testimony of the plaintiff and her husband, which showed that the plaintiff still bathed and dressed herself, could still drive, and did all the household cooking. *Id.* at 6-7. The evidence also showed that she was active in the community, danced at weddings, babysat her grandchildren, and took care of livestock. *Id.* at 7. Thus, her jaw injury was insufficient as a matter of law to constitute a permanent physical functional injury. *Id. See Weldon v. Presley,* N.D.Ohio No. 1:10-cv-1077, 2011 U.S. Dist. LEXIS 95248, 23 (Aug. 9, 2011), adopted by 2011 U.S. Dist. LEXIS 95247 (Aug. 25, 2011) (holding plaintiff, suffering from neck pain and stiffness after an automobile accident, had not suffered a permanent physical functional injury as a matter of law where she testified that her day-to-day life had not changed since the accident). *But see Giebel v. Lavalley,* N.D.Ohio No. 5:12-cv-750, 2013 U.S. Dist. LEXIS 181887, 33-34 (Dec. 31, 2013) (holding there was a genuine issue of material fact where plaintiff, suffering from PTSD, suicidal ideation, and depression after a brain injury caused by an automobile accident, suffered permanent physical functional injury).

{¶56} In this case, Mr. Potts testified that his ability to walk even short distances was diminished after surgery, and that he could not do any chores around the house that involved bending over, could not drive or ride in the car for long periods of time, could not walk upstairs, and could not sleep due to his pain. While Mr. Potts admitted that he had pain prior to seeing Dr. Durrani and that he had been on permanent disability, he testified that his situation was significantly worse after the surgery. Mr. Potts testified that his pain prevented him from sleeping in the same room as Mrs. Potts, and that he was diagnosed with post-traumatic stress disorder "from the surgery and everything that I had to go through." Mrs. Potts testified that Mr. Potts was no longer able to care for their family by performing household chores like he routinely did before the surgery. Drs. Bloomfield, Wilkey, and Saini agreed that Mr. Potts was in a worse condition after surgery than he was before. Yet, Mrs. Potts also testified that Mr. Potts was able to "get up and get a shower, and get dressed and get down [to the courthouse]" for the trial. Conflicting evidence was also presented as to how far Mr. Potts was able to walk after the surgery.

{¶57} The fact that there was conflicting evidence though, is not dispositive. Rather, our inquiry is whether there was sufficient evidence to submit the issue to the jury. While there was evidence that Mr. Potts's activity level was already subdued prior to surgery, both Mr. and Mrs. Potts testified that his ability to complete even basic tasks was severely diminished after his surgery. They also testified about the severe mental-health struggles that Mr. Potts dealt with post-surgery. The Pottses' experts all agreed that Mr. Potts's condition was made worse by the surgery. Considering the evidence presented at trial and the applicable case law, we hold that there was

22

sufficient evidence to submit the issue to the jury, and that the trial court did not abuse its discretion in doing so.

### C. Future Damages

{¶58} Next, appellants argue that the jury's award of future damages was not supported by the weight of the evidence, and that the evidence of future damages should not have been admitted. "Future damages are limited to losses which the plaintiff is reasonably certain to incur from the injuries." *Setters I,* 2020-Ohio-6859, 164 N.E.3d 1159, at ¶ 40. "A plaintiff's claim for future medical expenses must be supported by evidence that reasonably establishes the amount to be incurred in the future." *Id.* " '[T]he jury cannot be allowed to speculate or guess in making allowance for future medical expenses, and, to this end, there must be some data furnished to the jury upon which to predicate an estimate of future costs.' " *Id.*, quoting *Waller v. Phipps*, 1st Dist. Hamilton No. C-000758, 2001 Ohio App. LEXIS 4119, 10-11 (Sept. 14, 2001). In *Setters I,* this court determined that "evidence of how long [plaintiff] would require visits, how often she would require visits, and the costs associated with these types of procedures," was sufficient evidence of future medical expenses. *Id.* at ¶ 45.

{¶59} In this case, Mr. Potts was awarded $400,000 for future medical expenses. A review of the record reveals, as in *Setters I*, that there was evidence from which the jury could predicate an estimate of future costs. Dr. Bloomfield testified that the human body has exhausted all chance of getting better one to two years after surgery and that Mr. Potts, "as of 2013 * * * had reached any possible height of recovery from the injuries that he sustained at the time of that surgery by Dr. Durrani." Dr. Bloomfield opined that Mr. Potts would continue to need medical care in the future

23

from pain-management providers like he had received in the past. Bills from some of those providers were admitted into evidence for the jury's consideration. Dr. Wilkey testified that Mr. Potts's spine would "undoubtedly" never be the same again and that he would need "very specific spinal care" that likely would only be available at "a major spine center like the Cleveland Clinic." Dr. Wilkey estimated that the costs associated with any future treatment would be $200,000 for the surgeon's fee and between $100,000 and $150,000 for the hospital costs.

{¶60} Appellants rely on *Gillespie v. Sever*, 8th Dist. Cuyahoga No. 61002, 1992 Ohio App. LEXIS 3706, 10 (July 16, 1992) for the proposition that evidence of future expenses, "must be given in terms of 'probability' and not mere 'possibility.' " *Id.*, quoting *Logan v. Stovall*, 8th Dist. Cuyahoga No. 50069, 1986 Ohio App. LEXIS 5491 (Jan. 30, 1986). However, in *Gillespie,* a personal-injury case involving a knee injury, the trial court admitted a physician's testimony about the cost of a future knee replacement, but excluded evidence of other medical costs where the physician testified that "the costs were 'possible' and made no estimate of any specific total amount." *Id.*

{¶61} Unlike the testimony in *Gillespie*, Dr. Wilkey testified definitively that Mr. Potts was "going to need very specific spinal care," and he provided specific estimates for both the surgeon's fee and hospital costs. This testimony, combined with Dr. Bloomfield's testimony and the evidence of past medical expenses, provided a reasonable basis for the jury to estimate future medical expenses. The court did not err in admitting this evidence. Likewise, the court did not err in awarding future damages.

24

### D. Past Medical Expenses

**{¶62}** Appellants also assign error to the court's award of past medical expenses. Appellants contend that Mr. Potts only had $26,201.90 in out-of-pocket expenses and $2,540 in outstanding medical bills. Appellants argue that the trial court erred when it awarded Mr. Potts $404,378.65 in past medical expenses because the rest of his past medical expenses were paid by Humana and Medicare. While appellants frame their issue for review as one of standing, their actual argument is that Mr. Potts was not the real party in interest as to the rest of the past medical expenses.

**{¶63}** "The concepts of standing and real party in interest are related, but the interests being served and consequences for their absences are distinct." *McCann v. Durrani*, 1st Dist. Hamilton Nos. C-220025 and C-220033, 2023-Ohio-3953, ¶ 19. In *McCann*, we discussed and contrasted these two concepts. With respect to standing, we explained that it "refers to whether a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy." *Id.* at ¶ 20, quoting *Davet v. Sheehan*, 8th Dist. Cuyahoga No. 101452, 2014-Ohio-5694, ¶ 22, citing *Fed. Home Loan Mtge. Corp. v. Schwartzwald*, 134 Ohio St.3d 13, 2012-Ohio-5017, 979 N.E.2d 1214, ¶ 21. Standing is necessary to invoke the trial court's jurisdiction, and it must be determined at the time that the action is filed. *Id.* Lack of standing is not a defect that can be resolved at a later time by substitution of a party with proper standing. *Id.* If no party with standing has initiated the lawsuit, the complaint must be dismissed. *Id.*

**{¶64}** Turning to the concept of real party in interest, "the civil rules provide that '[e]very action shall be prosecuted in the name of the real party in interest.' " *Id.* at ¶ 21, quoting Civ.R. 17(A). As we explained in *McCann*:

> The question of whether a party has standing to sue is distinct from whether the party is the real party in interest. "The purpose behind the real party in interest rule is * * * to enable the defendant to avail himself of evidence and defenses that the defendant has against the real party in interest, and to assure him finality of the judgment, and that he will be protected against another suit brought by the real party at interest on the same matter." (Internal quotations omitted.) *Setters v. Durrani*, 2020-Ohio-6859, 164 N.E.3d 1159, ¶ 54 (1st Dist.), quoting *Shealy [v. Campbell]*, 20 Ohio St.3d [23,] 24, 485 N.E.2d 701 [(1985)]. The central concern of the real-party-in-interest rule is proper party joinder. *Id.* at ¶ 56, citing *Schwartzwald* at ¶ 33. Under Civ.R. 19(A), a person who "has an interest relating to the subject of the action as an assignor, assignee, subrogor, or subrogee" is a necessary party to be joined, if feasible. *Id.* However, because this rule is procedural, it must be timely raised, or else it will be waived. *Id.*

*Id.*

**{¶65}** It is the concept of real party in interest that applies to appellants' argument, as their assertion that it was error to award Mr. Potts past medical expenses that were paid by Humana and Medicare is a contention that Mr. Potts was not the real party in interest as to these expenses.

**{¶66}** The record demonstrates that Medicare had settled its liens with Mr. Potts, and that Humana had entered into a confidential settlement agreement with Mr. Potts wherein he was obligated to reimburse Humana from the funds that he

26

received. Thus, the real-party-in-interest issue was resolved and Mr. Potts was entitled to seek the full amount of past medical expenses.

{¶67} The Ohio Supreme Court has "declined to adopt a categorical rule that the reasonable value of medical services is either the amount billed or the amount paid." *Moretz v. Muakkassa*, 137 Ohio St.3d 171, 2013-Ohio-4656, 998 N.E.2d 479, ¶ 90, citing *Robinson v. Bates*, 112 Ohio St.3d 17, 2006-Ohio-6362, 857 N.E.2d 1195, ¶ 17. "Instead, the reasonable value of medical services is a matter for the jury to determine from all relevant evidence. * * * The jury may decide that the reasonable value of medical care is the amount originally billed, the amount the medical provider accepted as payment, or some amount in between." *Robinson* at ¶ 17-18.

{¶68} In support of its award for past medical expenses, the court looked to the amounts originally billed by Humana and Medicare, Mr. Potts's record of his out-of-pocket expenses, and billing records from Integrated Behavioral Services. The court reasoned that the jury's initial award for past medical expenses exceeded the maximum amount supported by the record. The court reduced the award to an amount supported by the medical bills. Thus, the court did not err in awarding $404,378.65 in past medical expenses.

### E. Prejudgment Interest and Court Costs

{¶69} Finally, appellants assign error to the court's award of prejudgment interest and court costs. In addition to their attack on the merits of the awards, appellants contend that appellee voluntarily withdrew the motions and the trial court had no authority to reinstate them.

{¶70} On August 20, 2019, appellee filed a motion to tax court costs. On October 22, 2019, appellee filed a motion for prejudgment interest. On October 23,

27

2019, appellee filed a "motion and proof of Deters Law staff and statement of attorneys' fees to be submitted on award of punitive damages and fees." On June 26, 2020, the court ordered the parties to come to an agreement on costs and attorney fees, while contemplating a future hearing on the issue, and denied appellee's motion for prejudgment interest. On July 9, 2020, appellee filed a motion to reconsider the court's decision on prejudgment interest.

{¶71} On March 5, 2021, appellee filed a notice of withdrawal of the motions for prejudgment interest, attorney fees, and court costs.[7] On March 30, 2021, appellants filed a notice of appeal that was assigned the appeal number C-210211. Meanwhile, litigation continued below on the issue of past medical expenses.

{¶72} This court ordered briefing on the issue of whether there was a final, appealable order given the unresolved issues below. On July 29, 2021, we dismissed the appeal numbered C-210211 for lack of a final, appealable order. In the order dismissing the appeal, we reasoned that the appellee's withdrawal of her motion for attorney fees was precluded by *Pattison v. W.W. Grainger, Inc.*, 120 Ohio St.3d 142, 2008-Ohio-5276, 897 N.E.2d 126 (holding that a party may not create finality for appeal after the resolution of one claim by dismissing the remaining claims against the same party). Thus, we treated the withdrawal as a nullity and held that the motion was still outstanding.[8]

---

[7] While the notice of withdrawal purports to withdraw a motion for attorney fees, we note that appellee did not file a motion for attorney fees in this case because the jury's verdict included an award of attorney fees. After the jury's verdict was entered, appellee filed a motion evidencing the *amount* of those fees. Thus, we presume the subsequent withdrawal of the motion for attorney fees to be erroneous. Likewise, appellants do not take issue with the attorney-fee award.

[8] While the dismissal order only refers to appellee's withdrawal of the motion for attorney fees, appellee had also withdrawn the motions for prejudgment interest and court costs.

{¶73} Our recently-decided case, *McCann*, 1st Dist. Hamilton Nos. C-220025 and C-220033, 2023-Ohio-3953, contained a similar procedural posture. The first appeal in *McCann* was likewise dismissed due to the lack of a final, appealable order based on this court's determination that McCann's withdrawal of a motion for prejudgment interest was precluded by *Pattison*. *Id.* at ¶ 45, citing *McCann v. Durrani*, 1st Dist. Hamilton No. C-210212 (July 29, 2021). However, after the initial dismissal and once a later appeal was perfected, we subsequently explained in *McCann* that our reference to *Pattison* in this context was erroneous "because *Pattison* referred solely to 'claims' and a motion for prejudgment interest and court costs is not a 'claim.' " *Id.* at ¶ 46. We stated in *McCann* that our opinion in *Nichols v. Durrani*, 1st Dist. Hamilton No. C-210224, 2021-Ohio-2973, controlled a determination as to whether a final, appealable order existed in this situation. *Id.* at ¶ 51.

{¶74} *Nichols* similarly involved the plaintiffs' withdrawal of a motion for prejudgment interest and attorney fees. In *Nichols,* we observed that when the time to file an appeal has been tolled by the filing of a motion for prejudgment interest and attorney fees, the time for filing a notice of appeal does not begin to run until "the trial court enters an order resolving the last of these post-judgment filings." (Emphasis sic.) *Id.* at ¶ 4, quoting App.R. 4(B)(2). Thus, we held that even though the Nicholses had withdrawn their motions for prejudgment interest and attorney fees, the time to appeal had not begun to run because the trial court had not yet entered an order resolving the motions. *Id.* at ¶ 5. We held that the notice of appeal was premature and dismissed the appeal. The appeal was dismissed rather than remanded under App.R. 4(B) because the order appealed from was not otherwise a final appealable order due to its failure to mention damages. *Id.* at ¶ 6. We stated, "We encourage the trial court

29

to expeditiously resolve the damages issue and enter an appropriate judgment—*as well as to enter an order resolving the Nichols' postjudgment motion*—so that a timely appeal may be perfected and the parties can receive appellate guidance and certainty." (Emphasis added.) *Id.* at ¶ 7.

**{¶75}** McCann argued that even if this court's reasoning in dismissing her appeal was erroneous, the law-of-the-case doctrine applied and we were required to stand by our earlier decision. *McCann* at ¶ 49. We first recognized in *McCann* that "[t]here is an exception to the law-of-the-case doctrine that compels a lower court to 'take notice of an intervening decision, by a superior court, that is inconsistent with the law of the case.' " *Id.* at ¶ 51, quoting *Dean v. Grange Mut. Cas. Co.,* 5th Dist. Stark No. 2004CA00133, 2005-Ohio-857, ¶ 10. We then held that given the timing of our order dismissing the *McCann* appeal (July 29, 2021), the release of the *Nichols* opinion (August 27, 2021), and the trial court's order reinstating the withdrawn postjudgment motions (August 30, 2021), the law-of-the-case doctrine was inapplicable on this issue because *Nichols* was an intervening decision. *Id.* at ¶ 51. We held that under those circumstances, "the trial court should have followed the guidance of *Nichols* rather than the erroneous reasoning of the dismissal entry," and that because McCann's motion for prejudgment interest had been withdrawn, the trial court's reinstatement of it was erroneous. *Id.* at ¶ 51-52.

**{¶76}** The procedural posture here is nearly identical to *McCann.* One month after the dismissal of appellee's 2021 appeal (July 29, 2021), this court issued the opinion in *Nichols* (August 27, 2021). The trial court then reinstated the Pottses' postjudgment motions on August 30, 2021, and subsequently granted the Pottses'

motions for prejudgment interest and court costs. Given this timing, the trial court should have followed the intervening decision of *Nichols*.

**{¶77}** In light of our reasoning in *McCann,* we hold that because the Pottses' motions for prejudgment interest and court costs were withdrawn, the trial court did not have authority to reinstate them. *See McCann*, 1st Dist. Hamilton Nos. C-220025 and C-220033, 2023-Ohio-3953, at ¶ 52. Accordingly, we sustain appellants' second assignment of error to the extent that the trial court erred in granting prejudgment interest and court costs and overrule it in all other respects. We remand the cause to the trial court to recalculate damages in this respect.

### *IV. Conclusion*

**{¶78}** For the foregoing reasons, we overrule the first assignment of error, but sustain the second assignment of error in part and overrule it in part. Accordingly, in the case numbered C-220024, we affirm the trial court's judgment in part, reverse it in part, and remand the cause for the trial court to recalculate the damages award as it relates to prejudgment interest and court costs, consistent with the law and this opinion. The appeal numbered C-220034 is dismissed.

Judgment accordingly.

**BERGERON** and **KINSLEY, JJ.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.

31